**In the Matter of the EXTRADITION OF Mahmoud Abed ATTA, a/k/a "Mahmoud El–Abed Ahmad", Defendant.**

**No. 88 CV 2008 (ERK).**

United States District Court, E.D. New York.

Feb. 14, 1989.

Ramsey Clark, Lawrence W. Schilling, Peter B. Meadow, New York City, for defendant.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Jacques Semmelman, Asst. U.S. Atty., Brooklyn, N.Y., Murray R. Stein, Dept. of Justice, Washington, D.C., for plaintiff.

### CORRECTED MEMORANDUM AND ORDER

KORMAN, District Judge.

On Saturday evening, April 12, 1986, an Egged bus was making its regularly scheduled run through various Israeli suburban communities located on the West Bank en route to its ultimate destination, Tel Aviv. The passengers using the bus on a Saturday evening would be Israeli settlers from these communities who were going to work, to visit friends and family, to the movies, or perhaps even to synagogue. As the bus passed near the Dir Abu Mishal intersection, one or more Molotov cocktails were hurled at it and the bus was strafed with automatic weapons fire by three individuals who had stationed themselves at a hillside vantage point. The driver of the bus, a civilian employee of Egged who did not live on the West Bank, was fatally wounded and another passenger was struck by shrapnel and rounds from an Uzi sub-machine gun.[1] The other two passengers, a woman and a man who resided on the West Bank, escaped injury.

Responsibility for the attack was claimed by the Abu Nidal Organization. According to the Foreign Information Broadcast Service:

The Abu Nidal Palestinian group had announced that it used machine guns and Molotov cocktails yesterday to attack a bus transporting Israeli soldiers and civilians between the villages of (Abu Mash'al) and (Abbud). In a statement released in Beirut, the group said that Kamal' Adwan group had carried out the attack, which left a number of people killed or wounded.

Gov't Exh. 18 (quoted in *In the Matter of the Extradition of Mahmoud Abed Atta,* 87–M–551, at 51 (E.D.N.Y. June 17, 1988)

[1988 WL 66866] [hereinafter Magistrate's Opinion]). The aims, objectives and modus operandi of the Abu Nidal Organization were described in an affidavit of Charles E. Allen, a career staff employee of the C.I.A., as follows:

4. ... The Abu Nidal Organization opposes any settlement of the Arab–Israeli dispute by diplomatic means, preferring the use of violence to reclaim what it considers to be Arab land lost to the State of Israel. It has conducted some 90 terrorist attacks since its inception in 1974—almost half of them since the beginning of 1984. At least 300 people have died and more than 575 have been wounded in attacks conducted by the Abu Nidal Organization. A number of those killed and wounded have been American citizens.

5. Despite its Middle Eastern roots, the Abu Nidal Organization has conducted almost three-quarters of its attacks outside the Middle East; only rarely has it organized attacks inside Israel, the West Bank, and Gaza. One of the few recent instances of an operation in this area attributed to the Abu Nidal Organization was the attack on the bus carrying civilians in April 1986 in which Mr. Mahmoud Atta [the defendant here] is implicated. While the Abu Nidal Organization has claimed a number of other terrorist attacks in the West Bank and Gaza, these claims have not been corroborated. Although the organization claims that its enemies are Israel and its supporters, its targets frequently are other Palestinians, including notably the Palestine Liberation Organization (PLO), and moderate Arab governments that have shown an interest in a negotiated solution to the issue of Palestine. The Abu Nidal Organization's victims, however, are frequently innocent bystanders, often of nationalities other than the intended target.

6. Abu Nidal himself was sentenced to death in absentia by the Yasir Arafat Fatah Command in 1974 for planning the murder of Arafat and other senior PLO

---

1. This passenger was "a cadet at a military boarding school." Magistrate's Opinion at 11.

officials. The Abu Nidal Organization has attacked PLO officials or offices in London, Kuwait, Paris, Islamabad, Brussels, Rome, Lisbon, Athens, Ankara and Belgrade, killing at least 11 leading Fatah members. Despite the Abu Nidal Organization's attention in recent months to intra-Palestinian politics and the building of a militia within the refugee camps in Lebanon, those efforts are in addition to—not a substitute for—Abu Nidal's basic strategy of using violence and terrorism to bring down Israel and to punish any who support or negotiate with its government.

7. From the foregoing, it is evident that the Abu Nidal Organization is principally engaged in the pursuit of violence and opposes peaceful efforts to establish a Palestinian state. It has engaged in violence far from the immediate zone of conflict and against basically civilian targets that may have only a remote connection to the Palestinian conflict. The Abu Nidal Organization occasionally has attacked third country intra-Arab targets at the behest of patron governments in exchange for safehaven and financial and logistical support. In the course of its history, the Abu Nidal Organization has at various times depended heavily upon Syria and Libya for support; many of its operations served to settle scores against non-Israeli adversaries of these states.

8. In sum, attacks by the Abu Nidal Organization in recent years have been more violent and designed to cause a maximum number of casualties. The group has threatened retaliation against states that hold its members prisoner, including the United States. It has followed through on such threats against the United Kingdom.

Gov't Exh. 17, at 2–4 (cited in Magistrate's Opinion at 41). In proceedings before Magistrate Caden, which are more fully described below, he found that "there is probable cause to believe that [the defendant here] was a member of this organization." Magistrate's Opinion at 41.

Shortly after the attack on the Egged bus, two Palestinians were apprehended by Israeli authorities. They signed sworn statements concerning their participation in the attack and eventually were tried and convicted on charges relating to their participation in the attack. The two men, it turns out, were cousins and the statements they made while in custody implicated a third individual, the defendant Mahmoud El–Abed Ahmad ("Ahmad"). Ahmad, they claimed, had fled from the West Bank after the attack.

In 1987 Israel learned that Ahmad was residing in Venezuela. On April 27, 1987 Ahmad was detained by Venezuelan officials on charges relating to his involvement in the Abu Nidal Organization. On May 5, 1987 Magistrate Caden issued a warrant for the provisional arrest of Ahmad, which was executed the next day when Venezuelan authorities placed Ahmad on a flight from Caracas Airport bound for the United States. On June 26, 1987 Israel formally requested that the United States extradite Ahmad so that he could be tried in Israel on charges of murder, attempted murder, causing harm with aggravating intent, attempted arson, and conspiracy to commit a felony, all in violation of various sections of the Israel Penal Law. Each of these crimes is covered by Article II of the Convention on Extradition Between the Government of the United States and the Government of the State of Israel, December 10, 1962, 14 U.S.T. 1707, T.I.A.S. No. 5476 [hereinafter Extradition Treaty or Treaty]. Accordingly, the United States filed an extradition complaint pursuant to 18 U.S.C. § 3181, *et seq.*

An extradition hearing was held before Magistrate Caden on December 16 and 17, 1987 and February 22, 1988. On June 17, 1988 Magistrate Caden denied the extradition request. Specifically, he concluded that the attack on the Egged Bus constituted a "political act" for which Ahmad was immune from extradition and that, even if Ahmad were subject to extradition, the Magistrate "would be unable to certify Ahmad for extradition on jurisdictional grounds" because Ahmad had been "brought illegally into the United States." Magistrate's Opinion at 58.

■ The United States Attorney then filed a second extradition complaint. While Ahmad objects to the filing of the second complaint and he understandably complains about the fairness of a procedure that permits his continued incarceration and allows the United States Attorney to relitigate issues of fact and law that were decided by Magistrate Caden, the law is clear that such a complaint may be filed and that the United States is entitled to a *de novo* hearing.[2] Accordingly, each party has been permitted to call additional witnesses to supplement the record. The result, however, would not be any different if the case were decided on the record before the Magistrate. The denial of extradition would have to be reversed because the Magistrate applied erroneous legal standards and because his findings of fact are plainly erroneous.

### (I)

Under 18 U.S.C. § 3184 and Article I of the Treaty, upon a request for extradition by a foreign state, jurisdiction may be exercised over one "found" in the United States to determine whether that person may be certified for extradition.[3] Magistrate Caden, however, held that because "Ahmad was brought to the United States unlawfully," jurisdiction could not be exercised here. Magistrate's Opinion at 62.

Specifically, Magistrate Caden found that "Ahmad was arrested by Venezuela at the request of the United States and for

the sole purpose of returning him for extradition to Israel, as Venezuela was unable to do so." *Id.* at 62–63. According to the Magistrate, "[o]ur constitution cannot be read to approve of such behavior for the mere purpose of taking advantage of our treaties, nor can allowing such an outcome foster foreign relations." *Id.* at 70. On the contrary, he reasoned, to allow a defendant to be "brought to the United States illegally from another country for the sole purpose of extraditing" him, would "negate the right of American citizens to take up residence in countries which have, by enacting or by their failure to enact [sic], created a legal setting that is beneficial to our citizens." *Id.* at 68.

■ The "finding of fact" underlying the Magistrate's conclusions of law, that the defendant was illegally brought to the United States, was predicated in large part on a "presumption" resulting from the unwillingness of the United States to litigate the issue whether it requested the deportation of Ahmad from Venezuela. *Id.* at 63. The evidence was insufficient, in the absence of this presumption, to support a finding that the United States asked Venezuela to arrest the defendant and deport him to the United States so that he could be extradited to Israel. Moreover, the United States came forward here with credible and compelling evidence establishing that it did not instigate the defendant's arrest, that it was not responsible for the

---

2. In *United States v. Doherty*, 786 F.2d 491 (2d Cir.1986), it was held that where the extradition magistrate denies a certificate of extradition, the denial of which is not subject to appeal, the "sole recourse" of the United States is to file another request "that must be considered *de novo* by the new extradition magistrate." *Id.* at 501; *see Collins v. Loisel*, 262 U.S. 426, 429–30, 43 S.Ct. 618, 619, 67 L.Ed. 1062, (1923) (traditional double jeopardy standards are inapplicable to multiple extradition applications). Indeed, the only limitation on the number of extradition requests is that each such request *must be based on a good faith determination* "that extradition is warranted." *Hooker v. Klein*, 573 F.2d 1360, 1366 (9th Cir.1978). Moreover, the fact that the issue here involves the political offense exception, rather than a determination of other issues, does not, as the defendant suggests, require a contrary result. In both *Doherty* and *Matter of Mackin*, 668 F.2d

122 (2d Cir.1981), cases involving the political offense exception, the Court of Appeals held that application of res judicata would be inappropriate, concluding instead that the determination of the "previous magistrate [should be accorded] only such weight as [a judge] would give to an opinion of a respected judge in an unrelated case." *Doherty*, 786 F.2d at 501; *see also Mackin*, 668 F.2d at 137 n. 20.

3. Article I of the Extradition Treaty provides that the United States is obligated to "deliver up [to Israel] persons found in its territory." The obligation under the Treaty is triggered by Ahmad's presence in the United States. *Cf. Ker v. Illinois*, 119 U.S. 436, 440, 7 S.Ct. 225, 227, 30 L.Ed. 421 (1886) (a defendant is "found" in the United States if he is present here even if his presence may have been unlawfully secured).

conditions of his confinement and that it did everything possible to encourage Venezuela to deport him to Israel rather than the United States. Gov't Exh. 25. This newly presented evidence is sufficient to resolve the jurisdictional issue.

The decision of the Magistrate to "divest" himself of jurisdiction, however, was erroneous as a matter of law even on the record before him. In *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), the Supreme Court held that "the power of a court to try a person is not impaired by ... reason of a 'forcible abduction.'" *Frisbie,* 342 U.S. at 522, 72 S.Ct. at 511. The premise underlying this rule, as applied to criminal cases, is "that due process of law is satisfied when one present in court is convicted of a crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." *Id.* Magistrate Caden distinguished these cases because, unlike a defendant who is "forcibly abducted" to stand trial in the United States, "[i]n an extradition proceeding designed to send the defendant out of the United States, the court cannot assure the accused will receive due process." Magistrate's Opinion at 66. Accordingly, "[g]iven this inability and the fact that Ahmad was brought into the United States in a constitutionally impermissible manner, the court would be required to divest itself of jurisdiction over Ahmad to determine whether he can be extradited to Israel." *Id.* at 67–68 n. 46.

The most that can be fairly drawn from the language in *Ker* and *Frisbie,* upon which the Magistrate relied, is that *if* the Constitution is violated by the manner in which a defendant's presence is procured, the remedy for that violation may depend on the process the defendant is provided in subsequent proceedings. The Magistrate, however, never explained why the manner in which he found Ahmad was brought into the United States was "constitutionally impermissible," although there are clearly defined standards for making such a determination. Specifically, in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1951), the Supreme Court held that the Due Process Clause was violated only by conduct "that shocks the conscience," *id.* at 172, 72 S.Ct. at 209, "offend[s] 'a sense of justice,'" *id.* at 173, 72 S.Ct. at 210, or runs counter to the "decencies of civilized conduct." *Id.* An analysis of the facts alleged here shows that there is no basis for holding, as the Magistrate suggested, Magistrate's Opinion at 65, that the Due Process Clause was violated.

Accepting as true the presumption indulged by the Magistrate, the United States asked Venezuela to deport the defendant, an American citizen, to the United States so that he would be extradited to Israel. There was probable cause to believe that he was a member of an international terrorist organization that killed or wounded a number of Americans and there was also probable cause to believe that he was guilty of murdering an Israeli citizen under circumstances that the State Department did not believe could be justified as a political act.

There is simply no basis for concluding that, under such circumstances, the request for the defendant's return to the United States "shocks the conscience," offends "'a sense of justice'" or runs counter to the "decencies of civilized conduct." While the Magistrate struggled to distinguish cases such as *Ker* and *Frisbie,* he ignored altogether the standard set out in *Rochin v. California, supra,* for determining whether a "forcible abduction" would violate the Due Process Clause. *See, e.g., United States ex rel. Lujan v. Gengler,* 510 F.2d 62 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975).

The Magistrate, to be sure, voiced concern that, if he exercised jurisdiction here, American citizens like the defendant, who are sought for murder and other heinous crimes, may be denied asylum by other countries and that such a result would not achieve "an outcome [that] foster[s] foreign relations." Magistrate's Opinion at 68, 70. These considerations, however, hardly provide a basis for concluding that

the Due Process Clause was violated. Moreover, they are not matters properly within the concern of an extradition magistrate. It is for the Executive Branch to decide whether it is in our national interest to discourage other countries from giving asylum to American citizens. Similarly, it is for the Executive Branch to determine whether seeking the expulsion of such a defendant to the United States for extradition "foster[s] foreign relations." Indeed, because Magistrate Caden found that the defendant "was arrested by Venezuela at the request of the United States and for the sole purpose of returning him for extradition to Israel, as Venezuela was unable to do so," *Id.* at 62–63, this case does not involve either "the infringement of a foreign nation's [territorial] sovereignty which results from unlawful seizure and abduction of persons … from the foreign nation's territory by American agents" or a possible "affront" to a foreign nation's sovereignty which results from obtaining the surrender of a defendant under false pretenses. *Fiocconi v. Attorney General,* 462 F.2d 475, 480 n. 9 (2d Cir.), *cert. denied,* 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972). Under these circumstances, there is no basis for relief on the ground that there was a violation of "a rule of what we would now call United States foreign relations law." *Id.* at 479; *United States v. Paroutian,* 299 F.2d 486, 490–91 (2d Cir.1962).

Finally, even if the manner in which the defendant was brought into the United States constituted an unreasonable seizure in violation of the Fourth Amendment, it would not have provided a basis for Magistrate Caden to have "divested" himself of jurisdiction. Particularly apposite is the holding of the Supreme Court in *Immigration and Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct.

3479, 82 L.Ed.2d 778 (1984). There, an alien "moved to terminate" a deportation proceeding "on the ground that [he] had been arrested illegally." *Id.* at 1035, 104 S.Ct. at 3481. The Supreme Court held that this claim was properly rejected:

> The "body" or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.... At his deportation hearing Lopez–Mendoza objected only to the fact that he had been summoned to a deportation hearing following an unlawful arrest; he entered no objection to the evidence offered against him. The BIA correctly ruled that "[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding."

*Id.* at 1039–40, 104 S.Ct. at 3483–84 (citations omitted).[4] This language is equally applicable here and would require the reversal of the Magistrate's decision to "divest" himself of jurisdiction even accepting the facts as he found them.

### (II)

Magistrate Caden also concluded that Ahmad was not extraditable under the political offense exception of the Treaty. Article VI, para. 4, of the Treaty states that extradition shall not be granted "[w]hen the offense is regarded by the requested party as one of a political character or if the person sought proves that the request for his extradition has, in fact, been made with a view to trying or punishing him for an offense of a political character."

### (A)

■ The history and present state of the political offense exception have been discussed extensively in a series of recent cases. *Quinn v. Robinson,* 783 F.2d 776

---

**4.** This holding is a complete answer to the Magistrate's conclusion that "[t]he limited process which a defendant can take advantage of in an extradition proceeding" is not sufficient to overcome any defect in the procedure which brought him to the United States. The process afforded in a deportation hearing is as limited, if not more so, than that afforded in an extradi-

tion proceeding. *I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 3483–84, 82 L.Ed.2d 778 (1984). Moreover, the habeas corpus, and subsequent appellate avenues open to the defendant significantly supplement the process afforded in extradition proceedings. *Peroff v. Hylton,* 563 F.2d 1099, 1103 (4th Cir.1977).

(9th Cir.), *cert. denied* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); *Eain v. Wilkes,* 641 F.2d 504 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed. 2d 208 (1981); *Matter of Mackin,* 668 F.2d 122 (2d Cir.1981); *Matter of Doherty,* 599 F.Supp. 270 (S.D.N.Y.1984). While these cases reflect continuing debate over the precise scope of the political act exception, the results reached in a line of cases beginning with *Ornelas v. Ruiz,* 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896), support the principle that "the United States does not regard the indiscriminate use of violence against civilians as a political offense." *Matter of Extradition of Demjanjuk,* 612 F.Supp. 544, 570 (N.D.Ohio 1985); *see Eain v. Wilkes,* 641 F.2d at 522–23; Lubet & Czackes, *The Role of the American Judiciary in the Extradition of Political Terrorists,* 71 J.Crim.L. & Criminology, 193, 202 (1980); *cf.* 18 U.S.C. § 2331 (attacks against United States nationals overseas punishable if such offenses are intended "to coerce, intimidate or retaliate against a government or a civilian population").[5]

Magistrate Caden, however, rejected the argument that the political offense exception should be so limited. According to the Magistrate, any act, regardless of how "heinous" or at whom it is directed, is a political act within the exception of the Extradition Treaty, provided that the motive for it is "purely political" and the act was incidental to a violent political uprising, civil war or rebellion. Magistrate's Opinion at 57. The extreme nature of this holding is highlighted by the testimony of

former Ambassador Fields, one of the defendant's expert witnesses upon whom the Magistrate relied. Magistrate's Opinion at 51. Ambassador Fields testified that the analysis that led him to conclude that the defendant's act was political would have required the same conclusion even if the victims "had been American tourists who were in Israel on a Christian pilgrimage" and the attackers, having reason "to believe that these were American tourists," "attacked them" anyway. T.2 at 176.[6]

The position that any atrocity qualifies as a political act if it is done for "purely political purposes" finds some support in a decision of a divided panel of the Court of Appeals for the Ninth Circuit in *Quinn v. Robinson,* 783 F.2d 776, 806 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). A majority of the panel agreed, albeit for different reasons, that the political act exception was inapplicable to a member of the Irish Republican Army who was wanted by Great Britain "for conspiring to cause explosions in London in 1974 and 1975" and for the murder of a police constable seeking to apprehend him for that offense. 783 F.2d at 781.[7]

Two judges of the Court of Appeals, however, adopted the view that any atrocity undertaken for purely political purposes comes within the political act exception. Under the analysis in the majority opinion in *Quinn,* which was written by Judge Reinhardt, the United States would be obligated to give safe harbor or passage to anyone who participates in any acts, how-

---

5. The State Department also adheres to the view that the political offense exception is not applicable to violent attacks on civilians. *See* T.1 at 264 (all references to "T.1" are to the transcript of the hearings held here); Lubet & Czackes, *supra,* at 196 n. 24.

6. All references to "T.2" are to the transcript of the hearings held before Magistrate Caden on December 16, 1987.

7. Judge Duniway, one of the two judges who concurred in this result, did so because he could not "believe that the framers of the treaty intended that the exception would embrace the kind of activities that the record in this case reveals." *Quinn,* 783 F.2d at 819. Judge Reinhardt, who agreed that the political act exception was inapplicable, did so on the limited

ground that the acts for which Quinn's extradition was sought took place in England rather than Northern Ireland. Otherwise, like Judge Fletcher, the third judge on the panel, he accepted the argument that indiscriminate attacks against civilians committed during an internal political struggle constituted a political act. *Id.* at 805. Judge Fletcher and Judge Reinhardt parted company on this issue only because Judge Fletcher was unable to agree with "Judge Reinhardt's conclusion that when PIRA members revolt against their British rulers in Northern Ireland, such acts are protected under the political offense exception, whereas the identical violent acts carried out against the same British rulers in London lose their protected status." *Id.* at 820.

ever heinous, as long as these acts were done for purely political purposes, occurred within the territorial limits of the civil war or uprising, were committed by persons who reside there (or, as in this case, had some significant tie to the territory), and had been used before "by revolutionaries to bring about change in the composition or structure of the government in their own country." *Quinn v. Robinson*, 783 F.2d at 806. The justification for such a broad definition of a political act is set forth in Judge Reinhardt's opinion as follows:

> It is understandable that Americans are offended by the tactics used by many of those seeking to change their governments. Often these tactics are employed by persons who do not share our cultural and social values or mores. Sometimes they are employed by those whose views of the nature, importance, or relevance of individual human life differ radically from ours. Nevertheless, *it is not our place to impose our notions of civilized strife on people who are seeking to overthrow the regimes in control of their countries* in contexts and circumstances that we have not experienced, and with which we can identify only with the greatest difficulty. It is the fact that insurgents are seeking to change their governments that makes the political offense exception applicable, not their reasons for wishing to do so or the nature of the acts by which they hope to accomplish that goal.
>
> Politically motivated violence, carried out by dispersed forces and directed at private sector institutions, structures, or civilians, is often undertaken—like the

more organized, better disciplined violence of preceeding revolutions—as part of an effort to gain the right to self-government. We believe *the tactics that are used in such internal political struggles are simply irrelevant to the question whether the political offense exception is applicable.*

*Id.* at 804–05 (citation omitted) (emphasis supplied).

Setting aside the fact that the qualifications of the rule as set forth by Judge Reinhardt cannot be reconciled with the sweeping rhetoric of his opinion,[8] his analysis is flawed for a number of reasons. Judge Reinhardt exaggerates what is, at most, a very indirect imposition on the tactics of combatants during a political uprising. The decision to extradite involves principally a decision regarding who may have refuge here. Whether or not it is "our place to impose our notions of civilized strife on people who are seeking to overthrow the regimes in control of their countries," it is plainly our place to decide who may obtain safe harbor in, or passage through, the United States. Providing refuge for those who seek political change is one thing, making the United States a haven for those who engage in conduct that "violates our own notions of civilized strife" is quite another matter. Judge Wood said it well in *Eain v. Wilkes*, 641 F.2d 504 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981):

> We do not need [terrorists] in our society. We have enough of our own domestic criminal violence with which to contend without importing and harboring with open arms the worst that other

---

8. The qualification that the tactic at issue must have been used previously by revolutionaries is precisely contrary to the Court of Appeals' holding that "tactics ... are simply irrelevant to the question whether the political offense exception is applicable." *Quinn*, 783 F.2d at 805. Similarly, the qualification that an act occur within the borders of the territory undergoing turmoil reflects a judgment on tactics, but more importantly ignores the fact that the territorial limitations of a conflict are not so easily defined (as this case and *Quinn* illustrate). Finally, the qualification that the act must be committed by those who reside in, or have some significant tie to, the area where the act is committed reflects a judgment that strangers should not be entitled to the benefit of the political offense exception

even if they are "idealists" who enlist in foreign revolutions because they are "enthusiastic for liberty." *See* S. Morrison, The Oxford History of the American People 230 (1965) (describing the motivation of the Marquis de Lafayette who along with other foreigners rendered significant assistance in the War of Independence, *id.* at 231–32). All of these qualifications, whether or not valid, demonstrate that, despite his protestations to the contrary, Judge Reinhardt's definition of the political act exception is hardly as "neutral" as he suggests. 783 F.2d at 804; *see* Lubet, *Taking the Terror Out of Political Terrorism: The Supplementary Treaty of Extradition Between the United States and the United Kingdom*, 19 Conn.L.Rev. 863, 871–72 (1987).

countries have to export. We recognize the validity and usefulness of the political offense exception, but it should be applied with great care lest our country become a social jungle and an encouragement to terrorists everywhere.

*Id.* at 520.

Moreover, the "majority" opinion in *Quinn* mistakenly criticizes as "non-neutral", "political", and "qualitative", *id.* at 804, a determination that is in fact required by the express terms of the treaty. An extradition magistrate's determination must be neutral, *i.e.*, it cannot be based on a judgment that one side or another is entitled to prevail, because such a judgment is a political one that magistrates and judges are incapable of making. On the other hand, the decision whether a defendant should be extradited must be based on whether "the offense is *regarded by the requested party* [here, the United States] as one of a political character," an inquiry which is inherently qualitative. Article VI, para. 4 (emphasis supplied); *see Ornelas v. Ruiz*, 161 U.S. 502, 511, 16 S.Ct. 689, 692, 40 L.Ed. 787 (1896) (the act must be qualified according to "the character of the foray, the mode of the attack, the persons killed or captured, and the kind of property taken or destroyed" (quoted in *Eain v. Wilkes*, 641 F.2d at 523)). Indeed, because the applicability of the political offense exception depends on whether the act is regarded as political under *our* law, it is difficult to understand why that determination should be made in a moral vacuum without reference to "our own notions of civilized strife."

The defendant argues, however, that a broad definition of what constitutes a "political act" serves the so-called "neutrality function." The premise of this argument is "that today's rebels may become tomorrow's victors" and, "all other considerations aside, a state may wish to remain aloof from political turmoil in another country, against the day when such involvement might be seen as sponsorship of one contending side or the other." Lubet, *Extradition Reform: Executive Discretion and Judicial Participation in the Extradition of Political Terrorists*, 15 Cornell Int'l L.J. 247, 251 (1982) [hereinafter *Extradition Reform* ] (quoted in Memorandum in Opposition at 48). While it is true that "today's rebels may become tomorrow's victors," they may also become tomorrow's non-entities. A decision against extradition, particularly in cases involving "heinous" acts, may be seen by today's rulers as something less than a demonstration of "neutrality," even if made by "a neutral court governed by internationally accepted standards." Lubet, *Extradition Reform, supra,* at 285. Moreover, history suggests that our relations with other nations, including nations with which we have been at war, or with groups such as the P.L.O., are more likely to be influenced by pragmatic considerations relating to the present and future rather than grievances of the past. While the likelihood that a decision to extradite will materially impair our relations with other nations at some future time is remote and speculative, the State Department voiced concern here about the effect that a denial of extradition will have on United States foreign policy. Specifically, a representative of the State Department testified that:

> Extraditing individuals charged with the murder of a civilian target and refusing to evoke the political offense exception to extradition is one of the United States's most important law enforcement tools in terrorist matters. Extraditing the defendant in this case will help to ensure that the United States does not become a haven for violent criminals charged with or convicted of offenses committed in other countries, and that the United States becomes viewed as a reliable partner in the fight against terrorism.

The United States recently criticized severely the Government of Mexico because the Mexican Foreign Ministry evoked the political offense exception to our '78 extradition treaty with Mexico in denying the extradition of William Morales to the United States. Morales is a United States citizen considered a Puerto Rico freedom fighter by the Government of Mexico who had been convicted of serious weapons possession charges in the United States federal and state

courts and sentenced to over one hundred years. It's important to the Department of State that a similar miscarriage of justice in this case be avoided.

T.1 at 269.[9] This testimony only serves to demonstrate why the present and future impact that an extradition decision will have in a particular case is one that should be weighed by the Executive Branch in determining whether to extradite.

### (B)

■ Of all the cases that reject the view that any atrocity, if politically motivated, is a political act, Judge Sprizzo's opinion in *Matter of Doherty*, 599 F.Supp. 270 (S.D.N.Y.1984), contains the most persuasive analysis. There, Judge Sprizzo rejected the proposition that only a showing that the offense charged occurred "during the course of and in furtherance of" a political disturbance is necessary "to sustain the political offense exception." Judge Sprizzo held that:

> Not every act committed for a political purpose or during a political disturbance may or should properly be regarded as a political offense. Surely the atrocities at Dachau, Aushwitz, and other death camps would be arguably political within the meaning of that definition. The same would be true of My Lai, the Bataan death march, Lidice, the Katyn Forest Massacre, and a whole host of violations of international law that the civilized world is, has been, and should be unwilling to accept.
>
> \*    \*    \*    \*    \*    \*
>
> ... *Surely an act which would be properly punishable even in the context of a declared war or in the heat of open military conflict cannot and should not receive recognition under the political exception to the Treaty.*

*Id.* at 274 (emphasis supplied).

Judge Sprizzo's analysis lends itself to a means of qualifying conduct that accommodates both the express terms of the Treaty and the principles of neutrality underlying it. In particular, Judge Sprizzo's conclusion that "an act which would be properly punishable even in the context of a declared war or in the heat of open military

conflict" cannot be considered a political offense, provides a "neutral" standard derived from rules governing the conduct of military personnel engaged in military conflict. These rules of engagement, which generally reflect international standards, are promulgated or accepted by members of the Executive and Legislative Branches who are far more capable than judges of making the moral and political judgments that necessarily underlie the determination of what acts are justified in the course of armed conflict.

If, as the defendant suggests, these rules are too inflexible or if they do not allow for a proper balancing of the need for terror as a tool of revolution, the remedy lies in appeal to the Executive Branch, which is politically accountable for its determinations, which is capable of making such non-legal judgments, and which retains the discretion to refuse extradition even if it is ordered by an extradition magistrate. Note, *Executive Discretion In Extradition*, 62 Col.L.Rev. 1312, 1322, 1323 (1962).

■ Under the analysis adopted by Judge Sprizzo, the crime for which the defendant's extradition is sought does not come within the political offense exception to the Treaty. It is undisputed that indiscriminate attacks by military personnel on civilians would be punishable under the rules of engagement. W. Hays Parks, the Chief of the International Law Section in the Office of the Judge Advocate General of the Army, stated that whether an act was a legitimate act of war or a punishable act depended on whether the act was against "military personnel and military objects" or against "civilians and civilian objects." T.1 at 77. Similarly, Ahmad's witness, Professor William Mallison, distinguished between civilians who did not have a functional part in the Israeli military and those who did, T.2 at 87, in reaching his conclusion that armed settlers, "as opposed to some kind of peaceful religious organization," are "lawful object[s] of attack." T.2 at 90.

9. All references to "T.1" are to the transcript of the hearings held here.

Parks and Mallison also agreed that some burden rests on a soldier to determine prior to his attack whether his target is indeed a military as opposed to a civilian target. T.1 at 78 (Parks stated that "[t]he law today basically says that if you are uncertain as to the use of a civilian object, it is to be presumed to be a civilian object until established otherwise."); T.2 at 94 (responding to the hypothetical where "people who may well be civilians, without full and adequate evidence, are assumed to be a military target," Mallison stated that "the U.S. Army has conducted war crime trials of U.S. personnel for assuming that Vietnam villages were lawful objects of attack when it was apparent in the particular factual circumstances that the villages were unarmed and had no way of defending themselves"). The differing conclusions of Parks and Mallison are entirely the result of different assumptions concerning whether the Egged bus allegedly attacked by Ahmad, and the settlers riding on it, were legitimate objects of military attack.

The assumption relied on by Professor Mallison—that the bus attacked, and all Israeli buses operating on the West Bank, serve primarily a military function—is clearly refuted by the record. According to Dr. Meron Benvenisti, whose credibility and reliability as a fact witness was attested to by the defendant and his own witness,[10] the bus attacked here, and other Egged buses operating on the West Bank, are "civilian" buses, T.1 at 334, which, given the route traveled by the bus attacked and the time of the attack, early Saturday evening, would very likely be carrying Jewish settlers from the "suburban part ... of the vast Tel Aviv metropolitan area," who were either traveling the short distance to Tel Aviv to go to work or to the movies, or possibly to synagogue. T.1 at 335. Although defendant's expert, Ms. Rishmawi, a lawyer who serves on the Board of Directors of the Palestinian Human Rights Organization, Al-Haq, stated that "[s]ome-

times you find Egged buses for the soldiers," T.1 at 607, her immediate characterization of the Egged buses was that they are "for settlements and settlers." T.1 at 594. Moreover, Dr. Benvenisti testified that, in addition to providing transportation for settlers, "tens of thousands" of Arabs relied on Egged buses to get to their jobs in Israel each morning. T.1 at 337.

Regarding the specific routes traveled by the Egged buses and the West Bank's road system in general, Dr. Benvenisti's testimony, as well as road and bus route maps, indicate that these were not developed primarily to serve Israeli military functions (indeed, the attack alleged here occurred on a road that dates back to the Ottoman Empire). According to Dr. Benvenisti, because of attempts to "lure ... suburbanites", to the West Bank and to accommodate their need for accessibility to nearby metropolitan areas, the emphasis since 1979–80 has been "to develop access roads to the areas adjacent to the metropolitan areas of Jerusalem and Tel Aviv." T.1 at 355. Dr. Benvenisti's assessment of the bus routes and the road development is supported by the maps of Israeli roads and bus routes he provided, Ct.Exhs. 3 & 4, which show clustered road development around populated areas, connected by roads running into the metropolitan hubs of Tel Aviv and Jerusalem.

In light of this testimony, it is apparent that the buses themselves or the routes they travel, cannot be considered other than civilian vehicles and roads which primarily serve civilian commuter and local transportation needs, and are occasionally used by military personnel. Accordingly, the legitimacy of an Egged bus as a military target would depend, as was not the case here, on its use as a military vehicle at the time of an attack.[11] Indeed, as Mr. Parks noted, "[j]ust because a bus may be used for military purposes does not [under

---

10. Dr. Benvenisti was a court witness, called over the objection of the United States Attorney, who the defendant considered to be the "best single source" of information about the situation on the West Bank during the relevant peri-

od. T.1 at 11. Moreover, defendant's expert, Ms. Rishmawi, accepted and relied upon Benvenisti's data in her own work. T.1 at 612–13.

11. While it is a matter of dispute whether at least one passenger on every Egged bus is re-

the law of war] mean you can go around blowing up or attacking every single bus." T.1 at 114.

Ahmad asserts, however, that the buses still must be considered legitimate military targets because the settlers, who are the most frequent passengers on the Egged buses traversing the West Bank suburbs of Tel Aviv and Jerusalem, are themselves legitimate military targets. According to Ahmad "*all* the West Bank settlers are sufficiently linked to the IDF ["Israeli Defense Forces"] and to the militry [sic] and political control system on the West Bank to be considered a para-military force and active participants in the occupation, domination, subjugation and repression of the West Bank population and in the intended annexation of the West Bank territory." Memorandum in Opposition at 50–51 (emphasis supplied). Moreover, according to Ahmad's expert, Professor Mallison, the Israeli Defense Forces are actually "assisted by these para-military Israeli settlements in the occupied territories" and "the settlers involved in this particular case" were actually a "functional part in the Israeli military structure." T.2 at 62, 87. These arguments fail when weighed against the record in this case and the rules of engagement.

The overwhelming majority of the 52,000 settlers living on the West Bank at the end of 1985 lived in the suburbs of Tel Aviv and Jerusalem which are civilian in nature. Def.Exh.J (M. Benvenisti, 1986 Report of the West Bank Data Project at 47). There are concededly settlements that are paramilitary in nature, the so-called Nahal settlements, *id.* at 48. According to Dr. Benvenisti, however, the settlements in this part of the West Bank often tend to "look[ ] like an American suburb. Detached villas, quite affluent and people again are commuters and you won't find any differences in that and like a—quite flourishing communities

[sic] in Long Island." T.1 at 341, 378. Moreover, Dr. Benvenisti noted that most of the settlers living in the Tel Aviv metropolitan area on the West Bank are not "ideologically motivated." T.1 at 330. On the contrary, "[t]hey settle in the occupied territories because of better quality of life and the fact that the apartments there are very inexpensive...." T.1 at 330. Indeed, the assertion by the defendant that "[e]ach and every one" of the settlers living on the West Bank is doing so "in clear violation of multiple precepts of international law," Memorandum in Opposition at 84, is premised on the civilian rather than military status of the settlers. T.1 at 290–91, T.2 at 63.

While Dr. Benvenisti had written that "all [settlers] carry personal arms and possess an arsenal of weaponry," Def. Exh. J (cited in Magistrate's Opinion at 45–46), and that "all settlers belong to the security force, being an integral part of the Israeli army (Territorial Defense Units)," Ct. Exh. 1 (M. Benvenisti, 1987 Report of the West Bank Data Project at 41), he acknowledged that these statements were materially incorrect. Dr. Benvenisti testified that only male settlers between the ages of 18 and 54, those eligible to serve in various Israeli defense units, would be likely to possess arms. T.1 at 376. Of this group of settlers, the number belonging to the Territorial Defense units is limited further to "those who live in smaller settlements." T.1 at 392. The other eligible reservists would satisfy their military obligations in Israel. T.1 at 392. Moreover, those settlers who carried arms when not on military duty (there were approximately 10,000 firearms "licensed" to the 52,000 settlers in the occupied territories, T.1 at 587), were under severe legal restrictions on the use that could be made of the weapons they carried. As Ahmad's witness, Professor Lesch, testified:

Q. Are there any legal restrictions on the use of weapons by settlers when they are not on active military duty?

---

quired to carry a weapon, if such a policy exists, its purpose is to provide protection for the passengers. The presence of such an armed guard

does not convert the bus into a military vehicle and subject all of the passengers to an indiscriminate attack. T.1 at 83.

A. Well, I know that during the current uprising, the settlers had petitioned the military government to have permission to shoot someone who was seen holding a molotov cocktail, for example, without having thrown it and they have been given permission to do that.

Q. That's now?

A. That's now. *Previously they would not have.* And I'm not a lawyer, as I say, but my understanding has been that the arms that they have, that they would carry with them, were to be used in self-defense. So that, if they are in a car and the car is attacked and they then feel that the only way to get out of that situation is in fact to shoot, then that would be a legitimate use but I think a lawyer would probably know the actual rules on that.

T.1 at 445–46 (emphasis supplied); *see also* Gov't Exhibit 50 (affidavit setting forth the regulations governing weapons use by settlers in 1986).

Professor Lesch also acknowledged that most settlers play a very limited role in perpetuating the military occupation of the West Bank and that some settlements were established over the objection of the Israeli military. T.1 at 452, 471–72. Professor Lesch agreed with the assertion that rather than facilitating Israel's occupation of the West Bank, "the occupation is made more difficult by the presence of settlers and that they need more military there because the settlers are there than they might otherwise need." T.1 at 484.[12] Indeed, Dr. Benvenisti has written that on occasion Is-

raeli "soldiers and officers were bodily harmed" by settler vigilantes. Ct. Exh. 1 at 41.

These facts do not establish that all settlers on the West Bank were a functional part of the Israeli military. On the contrary, while some settlers at various times did their reserve duty with the Territorial Defense Units, carried arms for self-defense, did guard duty at settlements or participated in the political process,[13] the overwhelming majority were civilians. Moreover, they were plainly civilians as that term is normally understood for purposes of determining legitimate objects of indiscriminate violent attacks. As Mr. Parks explained, the law governing the use of force even in time of war:

> makes a distinction between the civilians and persons directly participating in the military operation who pick up a weapon and actually engage in a fight at that time.
>
> . . . . .
>
> ... If you are a civilian you have to be directly involved in hostility for you to be attacked.

T.1 at 114–15. By way of example, Mr. Parks referred to the rules governing the conduct of American forces during the air campaigns over Viet Nam from 1965 to 1968 and in 1972:

> North Viet Nam mobilized over half a million of its civilians, I used the term in the strictest sense:
>
> First, to man anti-aircraft guns.

---

**12.** The principal "military" function ascribed to the settlements "[i]n times of calm" is to "serve the purpose of presence and control of vital areas, maintaining observation, and the like." R. Shehadeh, Occupier's Law: Israel and the West Bank (Revised Ed.) 109 (cited in Memorandum in Opposition at 51). The record is, however, clear that not all settlements are located for purposes of maintaining military control of vital areas and it is not entirely clear what significance maintaining observation "in times of calm" has in facilitating the military occupation. Moreover, as Mr. Parks testified, the fact that it was possible that civilians who had engaged in intelligence gathering activities might be riding on a bus would not provide a "license to attack the bus." T.1 at 92. Similarly, the fact that some settlements may have a more signifi-

cant role "in time of war," does not make an attack on civilians "in time of calm" a political act. T.1 at 81–82.

**13.** The defendant argues that "[a]s a political force, the settlers are intimately connected with the Israeli government, although in many ways they are independent of government control." Memorandum in Opposition at 58. The fact that adult settlers comprise a political force capable of influencing Israeli policy, does not make all settlers (and non-settlers in their company) appropriate objects of indiscriminate attack. T.1 at 92–94. Indeed, the logic of this argument would eliminate altogether any distinction between military and civilian targets.

Second, to restore the roads after they had been bombed.

Third, to move military supplies around and

Fourth, armed quite a few of them with small arms so that they could fire at low flying aircraft as they flew low over the area.

The rules of engagement for aircraft carrying out tactical missions, [sic] they could only fire upon such individuals when being fired upon. They could not otherwise consider them to be legitimate targets.

Similarly, *because these people engaged in some military activities, once they ceased that activity, we do not have the authority to carry out attacks against them.*

That was much more aggressive use of civilians in a military role than we'd say [sic] here where settlers moved into an area to live. I would not consider the settlers to be legitimate target [sic] simply on the basis of living in a particular contested area.

T.1 at 81–82 (emphasis supplied).

Mr. Parks testified that this conclusion was not altered by the fact that some of the settlers were armed or coordinated the defense of the settlements with Israeli military:

It's almost a chicken and egg type of situation. You have the settlers move into an area, the settlers are then attacked. I assume the normal settler cannot go down to the handy gun and tackle store and buy an [sic] weapon. He asked the Government for one, he or she is issued one for their self defense as opposed to a [sic] offensive operation. That should not make them susceptible to attack simply because they have now been issued that weapon.

If they are to be attacked in those areas on occasion they would want to coordinate what they are doing with the military to make sure that they are protected.

I don't consider that to be placing them in a position of becoming parts of the military. Whether it's correct or not, the law of war traditionally had made an [sic] are clear, distinction between the military and the civilian and when there had been attempts to codify or change that to have people who are quasi civilian, those attempts have been rejected by nations.

Most recent negotiations from 1974 to 1977 actually proposed three categories of civilians. Those involved in military operations. Those involved in the military effort which might be a fellow driving an ammunition truck. Those involved in the war effort such as Rosie the Riveter in World war II and those civilians not involved in anything.

There are 120 nation, a number of liberation organization, including the P L O, rejected that out of hand and said, no, there are military persons and there are those civilians who are taking a direct part in the hostility and only for the times in which they are doing that, are they susceptible to attack. I disagree that [sic].

I was frankly surprised by Professor Mallison and his testimony on that. Because I can say for a fact that is not what he has taught in his courses.

T.1 at 83–84.[14]

Moreover, even if distinctions could reasonably be drawn between different categories of civilians, the difficulty in this case, involving an attack intended to kill every passenger on the Egged bus, is the assumption that *all* settlers were armed, that *all* settlers engaged in lawless vigilante attacks on Palestinians, that *all* settlers served in the Territorial Defense Units, etc., and that, therefore, "none of the settlers, be they man, woman or child, can legitimately lay claim to civilian status." Memorandum in Opposition at 84.

---

**14.** The defendant claims to be a member of the PLO. Moreover, he acknowledges that "[t]he actor as described in the extradition papers is in essence a soldier, with military and political training, in an insurgency war directed against the Israeli occupation of the West Bank territory." Memorandum in Opposition at 79.

Absent this premise, even Professor Mallison, the defendant's expert, would not support the position that it was appropriate under the rules of engagement to firebomb the Egged bus for the purpose of killing every passenger. T.3 at 93.[15] This premise, however, is erroneous. The only thing that can be said about *all* the settlers is that they live on the West Bank. Based on the record summarized earlier, during the relevant period, only a majority of the male adults normally carried weapons and only adult males between the ages of eighteen and fifty-four living in small settlements served in the Territorial Defense Units. While some of the settlers engaged in the kind of lawless vigilante activity cited by the defendant, the record contradicts the premise that tens of thousands of armed settlers regularly engaged in indiscriminate acts of violence against Palestinians. T.1 at 336.[16] Moreover, the attack here was not on a vehicle known to be carrying settler vigilantes or others who had taken, or were about to take, violent action against Palestinians.[17]

Accordingly, stated in the light most favorable to the defendant, the most that can be said is that the defendant and his confederates attempted to murder every passenger on a civilian vehicle simply because one or more of the passengers could be described as "arguably non-civilian." Memorandum in Opposition at 90. Such an indiscriminate act of violence is not within the political offense exception.

### (C)

While Magistrate Caden adopted the broadest possible definition of what constitutes a political act, he made some effort to justify his determination here within the framework discussed above. Acknowledging that the settlers "do not fit the description of military personnel as it is commonly thought of," Magistrate's Opinion at 52, the Magistrate concluded that *all* settlers were subject to the kind of attack at issue here because "at a minimum they are willing participants in a civil war or violent community conflict designed to acquire a long sought after homeland." *Id.* This analysis, however, is contrary to the record.

Whether there was a violent political uprising sufficient to trigger the application of the political offense exception to an attack directed against an Israeli military vehicle, which is assumed for present purposes, there was no "civil war or violent

15. All references to "T.3" are to the transcript of the hearing held before Magistrate Caden on December 17, 1986. According to both Parks and Mallison, the burden rests with the attacker to determine before attacking an apparently civilian target, such as an Egged bus, whether it is indeed a legitimate military target, or at least to act according to normal expectations concerning the legitimacy of the target. T.1 at 78, T.3 at 89. Specifically, Professor Mallison's opinion on the propriety of the attack here was based on the premise that the settlers are not civilian "they are part of the military, para-military Israeli Army. They are supplied and trained by the Government of Israel." T.2 at 125. There was no obligation on the part of anyone firebombing the bus to make any effort to determine whether the passengers are military or civilian because normally the passengers on the bus are such settlers and "the soldiers would take that information from the norm." T.3 at 89; *see also* T.2 at 112.

16. The statistics cited by the defendant show that, in a five year period from 1980–1984, 23 Palestinians were killed and 191 seriously wounded by settlers. Mallison & Mallison, *Legal Postscript: The Law Applicable to Israeli Settler Violence in the Occupied Territories* 80–82 (quoted in Memorandum in Opposition at 60–61 n. 20). By contrast in the "408 days" since the *intifada* began there have been "at least 361 deaths and many thousands of injuries." New York Times, January 29, 1989, Sec. 4, p. 2. Most of these casualties resulted from confrontations with the Israeli army rather than with settlers. *Id.*

17. The defendant claims that this particular bus had just left "the Neve Tzuf settlement," which is "known [a]s a radical religious-nationalist settlement with a history of 'vigilante' violence against local Palestinians" and which contained "an IDF military post right on the settlement premises," Memorandum in Opposition at 79. Setting aside the fact that this description of the population of Neve Tzuf (in 1986) is contradicted by Dr. Benvenisti, T.1 at 340–41, and that the military post "wasn't there in 1986," T.1 at 720, the defendant had no way of knowing that all, or any, of the passengers on the Egged bus were from Neve Tzuf or that any of them had ever participated in any vigilante action against Palestinians.

community conflict" raging on the West Bank in April of 1986 of sufficient magnitude to transform every Palestinian and Israeli living on the West Bank into a combatant "capable of fitting the definition of either civilian or soldier." Magistrate's Opinion at 48. Dr. Benvenisti's testimony, which was similar to other credible witnesses, flatly contradicts this finding. Specifically, Benvenisti testified as follows:

Q. Let me ask you a question the other way. If you can answer it, fine. Suppose you were a Palestinian living on the West Bank in that area, would you be in mortal fear that you would be shot at any moment by Israeli settlers?

A. No, I don't think so. Arabs at that time thought that—their grievances— were not being shot. Their grievances were that Israelis would—they expect them to confiscate their land, to uproot their trees, but not to be shot, no. No. *It's different now. At that period, there was no kind of violence that you have now, which is violence and counterviolence, but not at that period, no.*

T.1 at 336 (emphasis supplied).

Moreover, the statistics cited by the Magistrate in support of his contrary finding, show that "disturbances of the peace" were occurring at a rate of less than ten per day during this period. Magistrate's Opinion at 47 (quoting Nairn, *The Occupation*, The Village Voice, March 1, 1988, at 26). The "disturbances" referred to included primarily "demonstrations, barricades, Palestinian flag hoistings or incidents of rock throwing." *Id.* These statistics hardly paint a picture of "a civil war or violent communal conflict" in which 800,000 Palestinians and 52,000 settlers were all combatants.

Against this backdrop, the Magistrate's reliance on the testimony of former Ambassador Fields adds nothing to his factually flawed analysis. Specifically, despite Fields' denial of any expertise in the rules of engagement, T.3 at 182, the Magistrate in fact considered Fields to have such expertise, and adopted his conclusion that

buses operating to and between settlement areas in the dark of night with what you would assume to be armed settlers aboard that bus could be *legitimate targets* for an insurgency group operating for the purposes of trying to terminate this period of occupation.

Magistrate's Opinion at 52 (quoting T.3 at 139) (emphasis supplied).

This conclusion was not only undermined by Ambassador Fields' lack of expertise, but also by the erroneous assumptions underlying all of his testimony in this area. For instance, during Fields' testimony the following exchange occurred:

Q. *Suppose that the victims of the attack had been American tourists who were in Israel on a Christian pilgrimage.* Suppose those were the victims of the attack. *Would your opinion be any different?*

A. If they had reason to believe that these were American tourists and they attacked them, *and given the fact that they were in this contested area,* riding in a bus that is known to be part of the logistical train of the settlements, then *I would be inclined to think that the tragedy as it might be, is that it would still fall within a political act.*

Q. And would the individuals who carried out the act have had any obligation to ascertain before carrying out the act that there were not American tourists on that bus?

A. I can tell you from twenty years experience in the military, two of which was on active duty and one of which was in Korea that if a vehicle comes down the road, and I don't care what it was, it was dark, and if it moved and I thought it was capable of attacking me, I was not going to perform a search and seizure. I was going to shoot first and ask questions later.

T.3 at 176 (emphasis supplied).

The premise underlying Fields' responses —that combatants in a contested area are under no obligation to discriminate between military and civilian personnel, and that civilians in effect assume the risk of attack every time they enter a contested

area—is clearly refuted by the testimony of both Professor Mallison and Mr. Parks, the acknowledged experts. More significantly, the assumptions made in Fields' responses render his views concerning the legitimacy of a particular target irrelevant to the disposition of this case.

First, Fields' testimony characterizes the attack alleged here as a response by the attackers to the perceived threat of attack. Putting himself in the shoes of would be attackers, Fields stated:

I don't care what it was, it was dark, and if it moved and I thought it was capable of attacking me ... I was going to shoot first and ask questions later.

T.3 at 176. Rather than supporting this characterization of the frame of mind of the attackers here, the evidence before Magistrate Caden supported just the opposite characterization. The attackers were not surprised by or unaware of the nature of the vehicle approaching them, nor were they threatened by it.[18] Moreover, all evidence indicates that the attackers surveilled the bus and its route on a number of occasions prior to the attack, knew exactly what type of vehicle they were attacking and that their attack was motivated by a desire specifically to kill all of its passengers.

Similarly, Fields mischaracterized the level of intensity of the confrontation alleged here. To justify his conclusion concerning the legitimacy of the attack on the bus, Fields alluded to so-called free-fire zones, in which anyone present has entirely assumed the risk of attack. T.3 at 177–83. While it is very unlikely that Fields description of the rules of engagement in these zones was accurate, T.1 at 116–21 (Testimony of Parks), even if his description were accurate, it would be inapplicable here. There was no evidence before Magistrate Caden to support the assertions (1) that a free-fire zone was expressly created by the

Palestinians by publication, as would be required under Fields' testimony, or (2) that violent occurrences in the area of the attack had become sufficiently frequent by April 1986 to justify the implied creation of a free-fire zone on the West Bank.

On the contrary, Dr. Benvenisti testified that, like other Israelis, he travelled on the West Bank in 1986 without fear, "without thinking twice where I am going to be." T.1 at 328–29, 402. Similarly, Ms. Rishmawi testified that, before 1986, the character of the conflict on the West Bank shifted away from armed attacks by individuals or small groups of Palestinians on Israeli soldiers and other targets, toward acts of civil disobedience by large numbers of Palestinians in the form of "general strikes, protests" which do not involve the throwing of "molotov cocktails and shootings, stabbings." T.1 at 580. Ms. Rishmawi conceded that this trend began in the mid-1980's, before the incident alleged here. This testimony, along with the testimony of Ambassador Lewis, confirms that violent attacks on settlers and Palestinians were not so frequent or predominant in April, 1986, that a free fire-zone was created by implication.[19]

More troubling than the lack of factual support for the Magistrate's holding are the implications that follow from his analysis. Specifically, he held that "[b]oth the Palestinians and the settlers are capable of fitting the definition of either civilian or soldier, and the West Bank can appropriately be described as territory upon which a civil war or a violent communal conflict is occuring." Magistrate's Opinion at 48. Accordingly, "[s]ince the political objective of both sides is to gain not only the right to govern the territory, but also the right to the land as homeland, *acts which impair the other side's abilities to govern and inhabit*, while furthering its own abilities

---

18. The testimony of both Dr. Benvenisti and Ms. Rishmawi indicated that in 1986 a Palestinian would not reasonably fear an armed attack to be launched from or directed at an Egged Bus. *See* T.1 at 327, 620.

19. Between April 1986 and May 1987, "[t]wenty two Palestinians were killed and 67 injured in violent incidents (seven killed by the army during demonstrations)" and "[t]wo Israelis were killed and 62 injured." M. Benvenisti, 1987 Report of the West Bank Data Project at 40 (Ct. Exh. 1).

to do the same," are political acts. Magistrate's Opinion at 49 (emphasis supplied). Under this definition, atrocities committed by either party would constitute political acts entitling the perpetrators to refuge in the United States.

The defendant rejects the Magistrate's analysis because it is premised on the conclusion that "legitimate arguments exist" to support the claim of both the settlers and the Palestinians "for the right to govern the West Bank," Magistrate's Opinion at 48, and because it would justify conduct that the defendant condemns as lawless vigilante violence by settlers against Palestinians residing on the West Bank:

> THE COURT: If Rabbi Kahane, a group of his followers went into an Arab settlement, shot up every man, woman and child because they believed that that would be a good way to encourage Arabs to leave the West Bank, that [in] your view would be a political offense as well?
> MR. MEADOW: That would not.
> THE COURT: Why not?
> MR. MEADOW: First of all, I think you get into the in re Meunier and the Abu Eain case which followed, which Mr. Semmelman was alluding to, *an act of terrorism against the people in general as opposed to an act against the Government itself or a government agent or the military.*

T.1 at 702 (emphasis supplied).

The justification offered by the defendant for characterizing his conduct as a political act and condemning similar conduct by a settler as "an act of terrorism" is that the settlers have no legitimate right to live in, or govern, the West Bank. T.1 at 703. Because all civil wars and political uprisings involve disputes over which side "ought to have the right to govern," Magistrate's Opinion at 48, this argument would require an extradition magistrate to render a judgment with respect to the validity of the perpetrator's claim that his victims lack political legitimacy. In the present case, Magistrate Caden was "neither able nor willing to determine which group, the Israelis or the Palestinians

ought to have the right to govern the West Bank." *Id.* Indeed, such decisions are of the kind that extradition magistrates are incapable of making regardless of where civil wars or violent uprisings rage.

Accordingly, if murder is to be regarded as a political act solely because of the perception of the perpetrator, or the validity of the perception, that his victims lack political legitimacy, that determination must of necessity and should as a matter of policy be made by the Executive Branch when it decides to grant extradition. The alternative would be to accept Judge Reinhardt's analysis in *Quinn* that any politically motivated violence directed against civilians is a political act and allow the perpetrators of such violence to remain in the United States. This is a result, as previously shown, that is not justified by either law or policy.

### (III)

Ahmad's principal remaining challenge to his extradition relates to the probable cause provisions of the Extradition Treaty. Article IV of the Treaty provides that:

> Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in that place or to prove that he is the identical person convicted by the courts of the requesting Party.

Ahmad claims that the accomplice testimony supporting the extradition request is inherently unreliable, self-contradictory, coerced, the result of torture, and not corroborated by the other evidence relevant to this issue. These arguments were properly rejected by the Magistrate.

■ To establish the level of probable cause necessary to certify one for extradition, evidence must be produced that is "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C.Cir.1973). The primary source of evidence for the probable cause determination is the extradition request,

and any evidence submitted in it is deemed truthful for purposes of this determination. *Collins v. Loisel,* 259 U.S. 309, 315–16, 42 S.Ct. 469, 471–72, 66 L.Ed. 956 (1922).

Here, among other evidence appended to Israel's request for extradition were sworn affidavits from each of Ahmad's alleged accomplices directly implicating Ahmad in the attack, *see* Gov't Exh. 1, and a video tape of one accomplice's reenactment of the attack depicting Ahmad's participation. *Id.* Ahmad argues that this evidence is insufficient to support a finding of probable cause and that the statements made in the accomplices' affidavits are not credible.

■ Relying on *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), Ahmad argues that it is indisputable "[t]hat a confession made by an accomplice that implicates a defendant is inherently unreliable...." Memorandum in Opposition at 102. These cases dealt with the admissibility of accomplice testimony at trial in violation of the Confrontation Clause of the Sixth Amendment. The hearsay and Sixth Amendment concerns on which these decisions were based, however, are not applicable to the determination whether there is probable cause to hold a defendant to answer for an offense. *Gerstein v. Pugh,* 420 U.S. 103, 120–22, 95 S.Ct. 854, 866–67, 43 L.Ed.2d 54 (1975). Moreover, accomplice testimony is of "particular importance in extradition cases where all the alleged criminal activity occurred in a distant country," *Eain v. Wilkes,* 641 F.2d 504, 510 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), and while such testimony is sufficient on its own to support the standard of proof required here, *id.* & n. 5, where that testimony has been corroborated by reliable evidence, it is more than sufficient. *See id.* at 510 & n. 6; *cf. United States v. Boyce,* 594 F.2d 1246, 1249 (9th Cir.), *cert. denied,* 444 U.S. 855, 100 S.Ct. 112, 62 L.Ed.2d 73 (1979) (corroborated accomplice testimony is more than sufficient

to support the finding of probable cause necessary to issue an arrest warrant).

■ Here, ballistics experts identified the Uzi sub-machine gun recovered from one of the accomplices as the weapon used in the attack. *See* Magistrate's Opinion at 10 n. 11. This evidence ties that accomplice to the attack and therefore provides a basis for crediting his testimony as coming from one with first hand knowledge of the attack and its perpetrators. Moreover, the Magistrate's account of Ahmad's travels since 1974, based on authenticated Israeli documents appended to Israel's request as well as Ahmad's passport, *see* Magistrate's Opinion at 20–22 n. 16, effectively corroborates the testimony of both accomplices. As the Magistrate noted:

> Ahmad traveled extensively in to [sic] the regions in which the conspirators indicated they saw him and in which they received their training. Moreover, Ahmad was in the West Bank at the time of the incident and left Israel, as indicated by the Israeli government, in May of 1986 [within one month after the attack].

*Id.* at 20. Accordingly, the accomplice testimony evidence, which is, under the rules governing extradition proceedings, deemed credible even without corroboration, sufficiently demonstrates that probable cause exists to support the certification of Ahmad for extradition.

■ Ahmad's other challenge to the showing of probable cause is grounded on allegations that the accomplices' affidavits were the result of coercion and torture, and were self-contradictory. Conflicts as to detail are present in the testimony of Ahmad's alleged accomplices, and credible evidence was introduced to demonstrate that torture has been used by Israeli officials to obtain confessions. *See* Magistrate's Opinion at 18 (referring to the Landau Report). While interrogation by torture is deplorable, there is no evidence that the confessions here were coerced or that they are not reliable. Indeed, the Court of Appeals only recently held, in a domestic context, that " '[n]either [18 U.S.C.] § 3501 nor the constitution mandates that a jury must disregard a confession if it believes the con-

fession was coerced.... ' " *United States v. Daley,* 865 F.2d 485, 492 (2d Cir.1989) (quoting *United States v. Barry,* 518 F.2d 342, 346 (2d Cir.1975)). Instead, a jury could give such weight to the confession that it deserves. Applying that standard here to the issue of probable cause (rather than the determination of guilt or innocence),[20] Magistrate Caden observed:

> The court must look at the circumstances as a whole to determine whether probable cause exists. Here probable cause exists. The confessions, whether or not induced by long periods of confinement or torture, are full of factual detail, are against the declarant's penal interest, have not been recanted, and are corroborated by significant other evidence. The confessions are, therefore, worthy of belief.

Magistrate's Opinion at 23.

██ Moreover, even if the record required a different conclusion regarding the credibility of the confessions, challenges to evidence submitted by the United States in an extradition proceeding are not permissible, *Collins,* 259 U.S. at 315–16, 42 S.Ct. at 371–72; *Shapiro v. Ferrandina,* 478 F.2d 894, 905 (2d Cir.), *cert. denied,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); Lubet & Reed, *Extradition of Nazis from the United States to Israel: A Survey of the Issues in Transnational Criminal Law,* 22 Stan.J.Int'l L. 1, 19 (1986). Instead, the allegations raised here must be directed to the State Department, which has discretion to grant or deny extradition. *Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir.1983); *Escobedo v. United States,* 623 F.2d 1098, 1105 (5th Cir.), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980).[21]

### Conclusion

Accordingly, for the foregoing reasons the application to have the defendant certified for extradition is granted. The certification is stayed on the condition that Ahmad file a petition for a writ of habeas corpus within thirty days from the date of this order.

Because this matter did not involve the exercise of my power as an Article III judge,[22] and because the defendant is entitled to collaterally attack this order in a habeas corpus proceeding, it seems appropriate that I not sit as an Article III judge in a habeas corpus proceeding to review the exercise of my authority as an extradition magistrate. The Clerk is, therefore, directed to assign the petition for a writ of habeas corpus to another judge by random selection.

SO ORDERED.

---

**20.** Before a jury would be permitted to hear a confession, a preliminary determination of voluntariness would have to be made by the trial judge. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Such preliminary determinations, which are concerned with the methods used to extract confessions rather than their reliability, *Rogers v. Richmond,* 365 U.S. 534, 540–541, 81 S.Ct. 735, 139–40, 5 L.Ed.2d 760 (1961), are not required before an arrest warrant may issue or before an indictment may be returned.

**21.** Ahmad also challenges Israel's extradition request on the ground that where, as is alleged here, offenses have been committed outside the territorial jurisdiction of Israel, the language of Article III of the Treaty prohibits extradition because the United States does not "provide for the punishment of such an offense committed under similar circumstances." Memorandum in Opposition at 114–15. While the validity of the premise underlying this argument is hardly clear, *see* 18 U.S.C. § 2331, Magistrate Caden correctly held that the Treaty expressly states that the requested party could, in its discretion, grant extradition. *See* Magistrate's Opinion at 14 (citing *Demjanjuk v. Petrovsky,* 776 F.2d 571, 581 (6th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986), for the proposition that the the phrase "extradition need not be granted" has a discretionary rather than a prohibitory meaning). Accordingly, where, as here, the United States has expressed its desire to extradite the party sought by Israel, Article III of the Treaty does not bar the extradition.

**22.** The powers conferred on an extradition magistrate are " 'judicial in their nature,' in the sense that they call[ ] for 'judgment and discretion.' " *Mistretta v. United States,* — U.S. —, —, 109 S.Ct. 647, —, 102 L.Ed.2d 714 (1989) (quoting *United States v. Ferreira,* 13 How. 40, 48, 14 L.Ed. 40 (1852)). These powers are not "judicial ... in the sense in which judicial power is granted by the Constitution to the courts of the United States." *Id.; see Jiminez v. Aristeguieta,* 311 F.2d 547, 555 (5th Cir.1962), Lubet & Czackes, *supra,* at 199.