In the Matter of THE EXTRADITION OF Lior ATUAR, also known as "Itamar Sinai" and "Daniel Rozen".

No. 503–MC–0104.

United States District Court,
S.D. West Virginia,
Beckley Division.

Dec. 12, 2003.

Philip H. Wright, Esquire, Assistant United States Attorney, Charleston, WV, for United States.

Edward H. Weis, Esquire, Assistant Federal Public Defender, Charleston, VA, for Relator.

### MEMORANDUM OPINION

VANDERVORT, United States Magistrate Judge.

On July 11, 2003, the United States, by counsel, Assistant United States Attorney Philip H. Wright, filed a Complaint under oath pursuant to 18 U.S.C. § 3184[1] in behalf of the government of the Republic of Turkey seeking the extradition of Lior Atuar, also known as "Itamar Sinai" and "Daniel Rozen" (Relator) to the Republic of Turkey based upon the Extradition and Mutual Assistance in Criminal Matters Treaty between the United States of America and the Republic of Turkey which was signed on June 7, 1979, and entered into force on January 1, 1981. (Document No. 1.) The United States' Complaint includes Exhibit No. 1 containing (1) the Declaration of Kenneth R. Propp, Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C., "charged with the extradition case of Lior Atuar."; (2) the Department of State Authentication of Mr. Propp's Declaration; (3) the request of the Republic of Turkey for the extradition of Lior Atuar dated April 16, 1999, stating as follows:

> Lior Atuar, born on March 30, 1970, in Israel, is sought by the Turkish authorities for involvement in a conspiracy to acquire, possess and sell heroin inside Turkey. As it was established that he had left Turkey following the commission of the said offenses, an international arrest warrant, Interpol Red Notice A—114/3—1997, has been drawn in his name. The United States Department of Justice has informed the Turkish authorities through two facsimile messages, dated 8 and 15 January 1999, that Lior Atuar was arrested in the State of Florida on drug trafficking and kidnapping charges.

(4) a copy of the Extradition and Mutual Assistance in Criminal Matters Treaty between the United States and the Republic of Turkey. The United States' Exhibit No. 1 also contains the Certification of James F. Jeffrey dated April 24, 2001, the Department of State's Deputy Chief of Mission in Ankara, Turkey, between 1999 and 2002, confirming the legal authenticity of a December 11, 2000, Memorandum "to the concerning judicial authority of the U.S.A." of a Judge in the Izmir Court of

---

**1.** 18 U.S.C. § 3184 provides as follows:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, or in cases arising under section 3181(b), any justice or judge of the United States, or any magistrate judge authorized to do so by a court of the United States, ... may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge to the end that the evidence of criminality may be heard and considered. * * * If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

State Security of the Republic of Turkey and attachments thereto written in the Turkish language and a translation of the Memorandum and attachments into English. By the Memorandum, the Izmir Court Judge requests the extradition of Lior Atuar to Turkey. The attachments to the Memorandum of the Turkish Judge are copies of the following documents:

1.  Articles 403/5, 403/6 and 403/7 of the Turkish Criminal Code with Articles 403/5 and 403/7 making it a crime to traffic or conspire to traffic in narcotics and specifying in Article 403/6 "heavy imprisonment to be imposed shall be doubled" for selling, purchasing or possessing heroin, cocaine, morphine or hashish; Articles 31, 33, 36, 40, and 59, penalty provisions; Articles 102 and 104, statutes of limitation;

2.  An Indictment and an Additional Indictment of the Antalya Office of the Public Prosecutor charging Fahri Yasin and Efrahim Dahan with acting as intermediaries between Hasan Erkus and Itamar Siani in an exchange of heroin, Hasan Erkus with selling and "Itamar Siani (David)", identified by the Public Prosecutor on March 9, 1992, as Lior Atuar, with purchasing heroin on May 3, 1991;

3.  A Decision of a Judge of the Antalya State Penal Court charging the four persons accused in the Indictment and Additional Indictment with violations of Articles 403/5, 6, and 7 of the Turkish Criminal Code, stating in detail the factual basis for the allegations against them and finding that jurisdiction was properly in the Izmir State Security Court and transferring the file there;

4.  A May 11, 1991, Protocol of a police officer indicating that Itamar Siani was detained at the airport on May 10, 1991, and "let into the superintendence" at 1:15 a.m. on May 11, 1991. The Protocol states that at about 3:45 a.m. Itamar Siani escaped;

5.  A May 16, 1991, Warrant for the Arrest of Itamar Sinai;

6.  A March 5, 1992, Warrant for the Arrest of Lior Atuar indicating that Lior Atuar is an Israeli citizen, August 30, 1963, is his date of birth, 583456 is his Israel identification card number, and 4364188 is his passport number;

7.  A December 11, 1991, Record of Identification based on Photograph indicating that Fahri Yasin identified the person depicted in a photograph as Lior Atuar as the person charged with him in the heroin transaction;

8.  An Examination Protocol of the Antalya First Minor Court for Petty Offenses and a May 12, 1991, Statement of Fahri Yasin consisting of five pages;

9.  Proceedings of the Prosecutor's Office [2];

---

**2.** It is apparent from the Examination Protocol that Fahri Yasin appeared in Court on May 16, 1991, for examination. The Protocol states as follows: "The preliminary documents have been read, the prescribed offense has been said. His defense and evidents have been asked. He replied: "I Fahri Yasin am for 15 days in the superintendence. By God! I am not well and healthy to give a statement. The vehicle 'Murat with license 34 FME' was by me for 1.5 years, but it was not transferred to me." When it was told him that heroin has been gotten hold of in that vehicle, what you say?, he replied: "By God! I can say nothing." In consequence of insisting that the defendant is not well to make a statement, his 5 page Statement dated 12th May 1991, which was given before by him at the Security Office has been read. Upon this the defendant insistingly said: "By God! Sir, I can not give a statement."

10. Protocol of a December 17, 1991, Session in the Court of State Security of the Republic of Turkey at which Fahri Yasin was present and represented by an attorney indicating that Mr. Yasin stated upon the reading of his examinations and statements given in Antalya Criminal Court that "they are same and right. My statements are valid." Respecting his statements made at the Criminal Court, Mr. Yasin stated that "[m]y statements given at the Minor Court and Criminal Court are right." Mr. Yasin was shown photographs at the session, and he stated that "[b]oth photos are belonging to David. According to the birth registry, his name is Itamar Siani. The person whom I personally have let be caught, is David, whose photos you have shown to me. If they would take me with, I could let to be caught Hasan too at Istanbul. But as David has fled, they didn't me take with, thinking that I might flee too. I have been kept 15 days in torture. I could not flee.";

11. A December 17, 1991, forensic report indicating that 34.482 kilograms of heroin and 6.896 kilograms of an intermediary substance in producing heroin from morphine were seized in conjunction with the alleged drug transaction of the four persons; and

12. A March 20, 1992, Decision of the State Security Court of the Republic of Turkey charging Fahri Yasin, Hasan Erkus, Lior Atuar and Efra-him Dahan with selling and purchasing heroin in violation of Articles 403/5, 6, and 7 of the Turkish Criminal Code and stating in detail the factual basis for the charges. The Decision also indicates that Hasan Erkus denied involvement in the heroin scheme and Mr. Yasin stated in Court that he was not the person who brought the heroin. Mr. Erkus was acquitted. For his part in the heroin transaction, Mr. Yasin was eligible for a sentence of 12 years, but with credit for cooperating, he received a sentence of five years in prison.[3]

The foregoing documents indicate the following factual scenario as the basis for the drug charges against Lior Atuar and others in Turkey. Having spent some time in prison, Fahri Yasin had loose or sporadic affiliation with Hasan Erkus in heroin dealing in Istanbul. He met "Itamar Siani" also known to him as "Davit" in Istanbul in 1990. Davit asked Mr. Yasin to find him some heroin. Mr. Yasin contacted Hasan Erkus and arranged a transaction between Hasan Erkus and Davit in heroin. In March, 1991, Mr. Yasin and Davit were taken to a house in Istanbul where Hasan Erkus stated the price he wanted for heroin. Mr. Yasin and Davit were returned to their hotel. Later, Mr. Yasin and Davit were taken to a place and shown heroin. The heroin was to be delivered to Antalya, and Davit was to pay for it there. Davit paid Mr. Yasin $34,000, and apparently, Mr. Yasin bought a Mercedes in Istanbul. Mr. Yasin and Davit flew from Istanbul to Antalya and went to

---

**3.** The Decisions of the Antalya State Penal Court and the State Security Court indicate that Mr. Yasin was arrested on May 15, 1991, three days after he gave a statement implicating "Itamar Siani" or "Davit" in the drug crime. It is evident from documents indicating that Mr. Yasin assisted police in arresting "Davit" on May 10, however, that Mr. Yasin was taken into custody some time before May 15 and as early as May 3, 1991. Mr. Yasin was therefore in custody for some period of time before he gave his statement on May 12, 1991.

a hotel. Hasan Erkus showed up, and the drugs and money were exchanged. Davit asked to use a car Mr. Yasin had. The car was in Istanbul. Mr. Yasin went to Istanbul. He and his brother drove the Mercedes and the other car to Antalya. Davit put the heroin in the car, and Mr. Yasin parked it in the parking garage of an Antalya hotel. He gave the keys to a parking attendant. It was early April, 1991, and Davit said he was leaving and would be back on May 10, 1991. On May 3, 1991, Mr. Yasin went back to the garage to get the car, and was arrested. He was interrogated and told the police that Davit was going to return on May 10 or 15. Working with the police, Mr. Yasin found out that Davit was flying in to the Antalya airport on May 10 at 10:00 p.m. He went with the police to the airport and pointed Davit out. The police arrested Davit, but Davit escaped at about 4:00 a.m. on May 11, 1991.

An Arrest Warrant was issued on July 14, 2003, and executed on July 18, 2003, at the Federal Correctional Institute, Beckley, West Virginia, where Relator "Daniel Rozen" is serving a term of imprisonment. (Document No. 7.)[4] On July 22, 2003, the United States filed a Motion to Detain Pending Extradition Hearing and Memorandum of Law in Opposition to Bail. (Document Nos. 2 and 3.) On July 24, 2003, the Court held a hearing with Relator in attendance to assure that Relator had a copy of the United States' Complaint and Motion to Detain, to inform Relator of the nature of these proceedings and to determine whether Relator qualified for the appointment of counsel. Having determined that Relator qualified for appointment of counsel, the Court appointed Assistant Federal Public Defender Edward H. Weis to represent Relator. (Document No. 5.)[5]

On August 4, 2003, the United States filed a Memorandum respecting the Law of Extradition. (Document No. 6.) On November 18, 2003, Relator filed a Memorandum in Opposition to Extradition. (Document No. 16.) Attached as Exhibit I to Relator's Memorandum is the Declaration of Fahri Yasin dated November 13, 2003. Mr. Yasin states as follows in his Declaration:

1. I know Davit also known as Itamar Siani also known as Lior Atuar, he is an Israeli citizen, who had visited me several times at my home in Turkey and was my guest.

2. On May, 1991, the Turkish police found heroin in my car, while it was parked in the parking garage of the Dedeman Hotel in Antalya. My car was parked at the hotel for about few weeks with the heroin in it, the entire time.

3. Following the discovery of the heroin in my car, I was arrested and the Turkish police had tortured me during the investigation, mainly because I didn't want to tell them any-

---

**4.** By Indictment filed on August 13, 1998, in the United States District Court for the Southern District of Florida and designated Case No. 1:98CR 00615–3, "Daniel Rozen" was charged with conspiring to possess, possessing and aiding and abetting in the possession of cocaine with the intent to distribute in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. § 2. The Court found that "Daniel Rozen" posed a flight risk and detained him. "Daniel Rozen" pled guilty to violating 21 U.S.C. § 846, and was sentenced to seventy months incarceration and a five year term of supervised release. He appealed his sentence, and his sentence was affirmed by unpublished decision on February 16, 2001. *See United States v. Rozen*, 250 F.3d 747 (11th Cir.2001). The Bureau of Prisons indicates that February 21, 2004, is the projected date of release for "Daniel Rozen."

**5.** Relator "Daniel Rozen" submitted a Financial Affidavit indicating that his date of birth is August 30, 1963. (Document No. 4.)

thing about the heroin which was found in my car.

4. The police had tortured me by electric shocks. They hung me by my hands. They also had beaten me and did not let me sleep for a few days. It was very painful until I couldn't stand it and decided to talk.

5. I was afraid to tell the police the name of the real person connected to the heroin, since I knew that he would hurt my family and me. Therefore I have chosen to lie to the police and said that the Davit (Itamar Siani) the Israeli and Hasan Erkus are the seller and purchaser of the heroin.

6. Despite the fact that Davit had nothing to do with the heroin that was found in my car, I told the police that he is connected. I knew that Davit is not a Turkish citizen and the chances to catch him are not good and I hoped that they will never catch him.

7. Today I know that they found him and I regret that I lied to the police about the heroin, mainly because I do not want that Davit, who had nothing to do with the heroin would be sentenced for a crime that he didn't do.

8. I signed this declaration after my Turkish attorney translated it to me to Turkish verbally.

9. I hereby declare that this is my name, this is my signature, and that the contents of this my declarations are true.

Relator contends that Mr. Yasin's May 12, 1991, statement that Relator was involved in the heroin deal cannot be considered in these extradition proceedings because it is the product of torture. Specifically, Relator asserts that Mr. Yasin's 1991 statement cannot be considered in view of Article 15 of the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment signed by President Reagan on April 18, 1988, approved by the United States Senate in 1990 subject to a number of reservations, understandings and declarations and ratified by and therefore entered into force as a treaty of the United States on November 20, 1994. Article 15 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment provides as follows:

> Each State Party shall ensure that any statement which is established to have been made as a result of torture shall not be invoked as evidence in any proceedings, except against a person accused of torture as evidence that the statement was made.

(Document No. 6, Exhibit IV.) Relator attaches the Department of State's Report on Human Rights Practices for 1991 respecting Turkey. The Report indicates that while efforts were made in 1991 in recognizance and advancement of human rights, "pervasive and credible reports of torture persisted throughout Turkey." (Document No. 16, Exhibit II.) Relator also attaches the Department of State's Report on Human Rights Practices—2002 respecting Turkey. *Id.*, Exhibit III. The Report states that "torture remained 'widespread' and 'systemic,' despite legal reforms reducing periods of pretrial and incommunicado detention." Relator claims further that consideration of the coerced statements of Mr. Yasin violate his due process rights. Relator also contends that the evidence submitted in behalf of the Republic of Turkey does not support the requisite finding of probable cause that Relator committed the offenses in Turkey.

On October 7, 2003, the parties filed a Joint Motion to Schedule Extradition Hearing. (Document No.) The Court held the extradition hearing on Wednesday, November 19, 2003. The United States of-

fered the testimony of Mr. Andrew Mounts, Special Investigative Assistant at the Federal Correctional Institute, Beckley, West Virginia, respecting two documents containing information about the Relator developed through the United States Marshal Service and available to the Bureau of Prisons. The documents indicate, among other things, that the Relator "Daniel Rozen" as he calls himself in these proceedings has used a number of other names including "Lior Atuar", has as his date of birth August 30, 1963, and is a citizen of Israel. (Document No. 18, Government's Exhibits 2 and 3.) The United States introduced as its Exhibit 4 the F.B.I. fingerprint certification of Daniel Rozen. The United States' Exhibit 5 is an Interpol Red Notice containing a 1991 photograph and fingerprints of Lior Atuar as they were taken in Israel. The Notice indicates that Lior Atuar was born in Israel on August 30, 1963, has Israel identification card number 5834546 and passport number 4364188. The Notice contains information about Lior Atuar's arrest in Antalya, Turkey, on May 10, 1991, and the March 5, 1992, warrant for his arrest issued "by the judicial authorities in Izmir, Turkey, for trafficking in heroin with accomplices." The Notice further indicates, no doubt on the basis of information obtained from Turkish authorities, that Lior Atuar used the name Itamar Siani stating March 30, 1970, as his date of birth. As its Exhibit 6, the United States introduced the Affidavit of John D. Amat, a Deputy United States Marshal and an expert in

fingerprint analysis, stating that he compared the fingerprints of Daniel Rozen and Lior Atuar contained in the United States' Exhibits 4 and 5 and determined that "both sets are of the same individual." Relator introduced as his Exhibits 1 and 2 the November 13, 2003, Declaration of Fahri Yasin in English as quoted above and in Turkish. A transcript of the November 19, 2003, extradition hearing has been prepared and filed. (Document No. 19.)

## DISCUSSION

*Applicable Principles of Extradition Law*

▮ "Extradition is an executive, not a judicial, function. The power to extradite derives from the President's power to conduct foreign affairs. An extradition proceeding is not an ordinary Article III case or controversy. It clearly is not a criminal proceeding. Rather, the judiciary serves an independent review function delegated to it by the Executive and defined by statute." *Martin v. Warden, Atlanta Pen,* 993 F.2d 824, 828 (11th Cir.1993) (Citations omitted.). The Court is limited to consideration of five factors in extradition proceedings, the first four of which are perfunctory:

1. Whether the judicial officer is authorized to conduct extradition proceedings; [6]

2. Whether the Court has jurisdiction over the relator; [7]

3. Whether the applicable treaty is in full force and effect; [8]

---

**6.** The undersigned United States Magistrate Judge is authorized to preside over these extradition proceedings by virtue of the specific grant of authority upon the District Court's allowance contained in the extradition statute, 18 U.S.C. § 3184, and the District Court's Local Rule of Magistrate Procedure 1.02(a)(17) ("(a) Magistrate judges are also authorized to * * * (17) conduct extradition proceedings in accordance with 18 U.S.C. 3184.")

**7.** 18 U.S.C. § 3184 provides that the Court has jurisdiction where the relator is found. Relator is currently in the custody of the Bureau of Prisons in this jurisdiction.

**8.** There can be no question that the Extradition and Mutual Assistance in Criminal Matters Treaty between the United States and the Republic of Turkey remains in full force and effect.

4. Whether the crime for which relator's surrender is sought is included within the terms of the treaty; [9]

5. Whether there is probable cause to believe that the crime for which relator's surrender is sought was committed and that relator participated in or committed it.

*Extradition of Garcia,* 890 F.Supp. 914, 917 (S.D.Cal.1994), *citing Bingham v. Bradley,* 241 U.S. 511, 36 S.Ct. 634, 60 L.Ed. 1136 (1916); *McNamara v. Henkel,* 226 U.S. 520, 33 S.Ct. 146, 57 L.Ed. 330 (1913), and *Zanazanian v. United States,* 729 F.2d 624 (9th Cir.1984). In considering the fifth factor, the Court must consider factual evidence. The Court must determine whether there is sufficient evidence to support criminal charges covered by a valid treaty. If so and the Court is satisfied that the other four factors are met, the Court must certify to the Secretary of State that the relator is extraditable. *Sidali v. I.N.S.,* 107 F.3d 191, 195 (3d Cir.1997). Humanitarian considerations are not within the province of the Court. *See Cornejo–Barreto v. Seifert,* 218 F.3d 1004, 1010 (9th Cir.2000). Rather, they are for consideration of the Department of State. *Extradition of Mainero,* 990 F.Supp. 1208, 1230 (S.D.Cal.1997). Certification that the relator is extraditable does not constitute a final order. *Noel v. United States,* 12 F.Supp.2d 1300, 1302 (M.D.Fla.1998). The final decision to surrender the relator to the requesting state rests with the Department of State

upon the Court's certification that relator is extraditable.

■ "Evidence sufficient to sustain the charge" is determined on the basis of probable cause in extradition proceedings. The probable cause standard is identical to the probable cause standard applicable in preliminary hearings in federal criminal proceedings under Rule 5.1(e) of the Federal Rules of Criminal Procedure. *Sidali, supra,* 107 F.3d at 199; *Sindona v. Grant,* 619 F.2d 167, 175 (2d Cir.1980); *Extradition of Cervantes Valles,* 268 F.Supp.2d 758, 772 (S.D.Tex.2003). Magistrate Judge Ramos defined the standard as follows in *Extradition of Cervantes Valles,* 268 F.Supp.2d at 772:

> Probable cause is the existence of reasonable grounds to believe the accused committed the offense charged. *See Extradition of Diaz Medina,* 210 F.Supp.2d at 817. This term signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.

It appears that this definition is acceptable in the Fourth Circuit. The Court stated in *Collier v. Vaccaro,* 51 F.2d 17, 20 (4th Cir.1931), reviewing the District Court's decision in an extradition case, that "[i]t is for the ... committing magistrate, to determine whether upon the evidence adduced before him there is reasonable ground to believe that the crime charged has been committed ...."

9. The Treaty With the Republic of Turkey on Extradition and Mutual Assistance in Criminal Matters provides for reciprocal extradition of persons upon request who are being prosecuted for, are charged with or have been convicted of committing an extraditable offense within the jurisdiction of the requesting party. Treaty, Article 1, ¶ 1. Extraditable offenses are "[o]ffenses listed in the Appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty." Treaty, Article 2, ¶ 1(b). The Appendix to the Treaty, ¶ 29, makes "[o]ffenses against the laws relating to narcotic drugs, Cannabis sativa L., hallucinogenic drugs, cocaine and its derivatives, and other dangerous drugs and chemicals." extraditable.

■ The Court has discretion within specific boundaries to admit and consider evidence on the issue of probable cause. *Extradition of Kraiselburd,* 786 F.2d 1395, 1399 (9th Cir.1986). The Court may not admit and consider evidence submitted by Relator which merely conflicts with or contradicts evidence submitted by the United States on the issue of probable cause or impeaches the credibility of witnesses, but the Court may admit and consider explanatory evidence submitted by Relator if it would clearly negate or obliterate probable cause. *Extradition of Koskotas,* 127 F.R.D. 13, 25 (D.Mass.1989); *Extradition of Garcia,* 890 F.Supp. 914, 922—23 (S.D.Cal.1994).

■ By their terms, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not apply. *See* Fed. R.Crim.P. 54(b)(5) and Fed.R.Evid. 1101(d)(3). Article 7(1)(c) of the Treaty between the United States and Turkey, however, provides that the contents of a request for extradition must include "[s]uch evidence as, according to the laws of the Requested Party, would justify arrest and committal for trial of the person sought if the offense had been committed in the territory of the Requested Party." The functional equivalent of a Complaint with supporting affidavit indicating that there is probable cause to believe that an offense has been committed and the relator has committed it or an Indictment is required.

■ In determining if probable cause exists, the Court must consider whether Relator is the person whose extradition is requested. "The Government need only make out a prima facie case to establish identification. Numerous cases establish that identification in an extradition proceeding requires only a threshold showing of probable cause." *Extradition of Demjanjuk,* 612 F.Supp. 544, 548 (N.D.Ohio 1985) (Citation omitted). Sworn state-ments of eye witnesses and photographs may be used to identify persons sought for extradition. *Id.,* 612 F.Supp. 544 at 550; *Extradition of Singh,* 123 F.R.D. 108, 117 (D.N.J.1987)("[I]dentification of accused by different names in judicial documents does not bar extradition. *Fernandez v. Phillips,* 268 U.S. 311, 312, 313, 45 S.Ct. 541, 542, 543, 69 L.Ed. 970 (1925)"). If the Government attempted to establish identity solely on the basis of defendant Singh's name, there might be a different question. However, the Government intends to offer photographic identifications and fingerprint and handwriting analyses, any of which may identify him as the person whose extradition is sought.; *Noel v. United States,* 12 F.Supp.2d 1300, 1304 (M.D.Fla.1998)(Identification based upon birthday, nationality and appearance (*via* a photograph) is sufficient.).

Several Courts have considered accomplices' and coconspirators' recantations of their earlier statements offered as proof of relators' commission of offenses in requesting jurisdictions and evidence that the statements were obtained through coercion and torture. In *Eain v. Wilkes,* 641 F.2d 504, 511 (7th Cir.1981), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), relator's extradition was requested on grounds that he was involved in a bombing in Israel. Sworn statements were introduced as evidence including the statements of Jamil Yasin and Mufida Jaber, Mr. Yasin's cousin, indicating that they were accomplices with relator in the bombing. Relator offered declarations of Yasin and Jaber given to their private counsel while they were in prison recanting their prior detailed inculpatory statements implicating relator in the bombing given to an Israeli police officer. The Magistrate Judge refused to admit the declarations and determined that relator was extraditable. Considering relator's appeal of the District Court's denial

of relator's petition for writ of *habeas corpus,* the Seventh Circuit affirmed. The Court stated that accomplice testimony is "particular[ly] important in extradition cases where all of the alleged criminal activity occurred in a distant country." *Id.,* 641 F.2d at 510. The Court stated further that such testimony is sufficient to support a finding of probable cause and is more than sufficient if corroborated by reliable evidence. *Id.,* at 510 nn. 5, 6. The Court found Mr. Yasin's statement offered in support of the request for relator's extradition reliable because "Yasin's statements inculpated both himself and petitioner in commission of the bombing." *Id.,* 641 F.2d at 510. The Court further found that Yasin's statement was corroborated by the statements of an investigating police officer and Ms. Jaber and the conduct of the relator himself of concealment and flight. *Id.,* at 511. The Court further relied on the fact that a judicial officer in Israel had "determined that the witnesses understood their statements and that the statements were made of their own free will." *Id.,* at 511. The Court found that the Magistrate Judge properly refused to admit evidence that Yasin and Jaber recanted their statements implicating relator in the bombing because "[t]he later statements do not explain the government's evidence, rather they tend to contradict or challenge the credibility of the facts implicating petitioner in the bombing. Therefore, the magistrate properly decided that such a contest should be resolved at trial in Israel. The alleged recantations are matters to be considered at trial, not the extradition hearing." *Id.,* at 511—12.

In *Republic of France v. Moghadam,* 617 F.Supp. 777 (N.D.Cal.1985), the Court distinguished *Eain, supra,* where the original statements had more indicia of reliability than the recantations finding the recantation statement more reliable than the original statement implicating relator in heroin smuggling. The Court found that

"Custer's initial statement made before a French magistrate was self-serving since she attempted to shift the bulk of the blame to Moghadam. * * * In contrast the recantation was not self-serving in any fashion. In fact, quite the contrary, the recantation went against Custer's self interest in being transferred from the French jail. Thus, Custer's recantation appears to have more indicia of reliability than the original accusations." *Id.,* at 783.

In *Extradition of Singh,* 123 F.R.D. 108 (D.N.J.1987), India sought relators Sukhminder Singh's and Ranjit Singh Gill's extradition for their alleged involvement in several murders based in part upon the confession of Sukhdev Singh implicating them. Citing Amnesty International reports that torture is commonly used in interrogating persons politically opposed to the Indian government, relators contended that Sukhdev Singh's confession was obtained through torture and requested discovery. The Court denied it adopting the reasoning of the Magistrate Judge in *Eain v. Wilkes, supra,* and finding that relators were actually challenging Sukhdev Singh's credibility and the reliability of his confession. *Extradition of Singh,* 123 F.R.D. at 118. The Magistrate Judge issued a certificate of extraditability, and relators filed a *habeas* petition relying in part upon the finding of an Indian Court that the confession of Sukhdev Singh was not voluntary and was not true. *See Gill v. Imundi,* 747 F.Supp. 1028, 1037 (S.D.N.Y.1990). The District Court granted relators' petition stating that "an adjudication in the courts of the requesting country that the very recanted statement upon which the requesting country here relies in an extradition proceeding is untrue and involuntary ... would appear to be of considerable potential relevance to an extradition judge charged with making a determination whether it is reasonable to believe, on the basis of such a statement

and other evidence presented, that the accused committed the crimes for which his extradition is sought." *Id.*, at 1046.

In *Extradition of Atta*, 706 F.Supp. 1032 (E.D.N.Y.1989), Israel requested the extradition of Mr. Atta and Mr. Ahmad on the basis of the confessions of accomplices implicating them in a violent attack on a bus there. Mr. Ahmed claimed that the accomplice confessions were inherently unreliable, self-contradictory, coerced, the result of torture and not corroborated by other evidence. *Id.*, 706 F.Supp. at 1050. Finding probable cause, the Court stated citing *Collins v. Loisel*, 259 U.S. 309, 315—16, 42 S.Ct. 469, 471—72, 66 L.Ed. 956 (1922), that "[t]he primary source of evidence for the probable cause determination is the extradition request and any evidence submitted in it is deemed truthful for purposes of this determination." *Extradition of Atta*, 706 F.Supp. at 1050—51. The Court found that there was no evidence that the confessions were coerced or unreliable and pointed out that in some circumstances when it is established that they were voluntarily made, even coerced confessions may be admitted at trial and given such weight as the jury finds appropriate. *Id.*, 706 F.Supp. at 1051. *See also Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir.1997), *cert. denied*, 522 U.S. 874, 118 S.Ct. 192, 139 L.Ed.2d 130 (1997)("The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired." Any statement given freely and voluntarily without any compelling influences is admissible in evidence. The government bears the burden of proving by a preponderance of the evidence that the statement was voluntary. To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.(Citations Omitted.)) The Court concluded its consideration of Ahmad's challenges to the accomplices ' confessions by stating that "the allegations raised here must be directed to the State Department, which has discretion to grant or deny extradition." *Extradition of Atta*, 706 F.Supp. at 1052.[10]

In *Extradition of Contreras*, 800 F.Supp. 1462 (S.D.Tex.1992), Mexico sought extradition of relator for weapons smuggling and amassing of arms and offered eleven confessions of persons arrested in a raid which resulted in the seizure of arms implicating relator as the source of the arms. Relator claimed that the confessions were coerced and recanted at the first opportunity in a judicial hearing. *Id.*, 800 F.Supp. at 1465. The Court found that all of the confessions given upon the persons' arrests were recanted at a judicial declaration hearing a couple of days later. The Court determined that reliability ran to the subsequent retractions because it was evident that the persons were coerced, some by torture, to sign their original statements and they recanted their original statements at the first opportunity in Court without having an opportunity to discuss them with an attorney. *Id.*, 800 F.Supp. at 1468—69. In concluding that the extradition request should be denied, the Court stated the applicable standard in

---

10. *Atta* did not involve recanted accomplice statements or a judicial determination that the statements were involuntary or untrue.

assessing recantation of statements obtained by coercion as follows in consideration of the Courts analysis in *Eain, supra:*

> Obviously, where the indicia of reliability is on the prior inculpating statement, then a recantation, if admitted, would not negate the existence of probable cause; or if the recantation only controverted a prior inculpating statement, then it would not rebut the probable cause evidence. However, where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane. *Extradition of Contreras,* 800 F.Supp. at 1469.

In *Extradition of Garcia,* 890 F.Supp. 914 (S.D.Cal.1994), relators argued that statements of coconspirators implicating them in offenses in Mexico were so tainted because of torture that any probable cause established by the statements was obliterated. *Id.,* 890 F.Supp. at 923. The Court distinguished *Contreras* and *Moghadam* finding that relators "were unable to proffer to the court that the statements of the co-conspirators were 'recanted' in their entirety." *Extradition of Garcia,* 890 F.Supp. at 923. Relators wanted to introduce testimony of persons who had personally discussed with the coconspirators the nature and extent of the torture to establish that their statements were not voluntary. The Court noted that Courts in Mexico give persons the opportunity to adopt, reject or amend their statements and when given the opportunity, the coconspirators did not do so but rather reaffirmed and adopted their prior statements almost in their entirety. The Court stated as follows:

> The *Contreras* court reasoned that while the state of the law is that the respondent is not entitled to introduce contradictory evidence at an extradition hearing, the respondent is entitled to introduce 'explanatory' evidence. Since evidence of torture and recantation at first opportunity thereafter would 'explain away' any probable cause, absent other independent evidence, it is believed that if such testimony were admitted, probable cause would not exist. However, ... that is not the case here. The co-conspirator confessors failed to recant their confessions when first presented with the opportunity to do so.

*Extradition of Garcia,* 890 F.Supp. at 924.

In *Extradition of Mainero,* 990 F.Supp. 1208 (S.D.Cal.1997), relators' extradition was sought to Mexico for their commission of murder, criminal association and carrying military firearms. Relators offered evidence that alleged coconspirators were subjected to torture and under duress when they gave statements implicating relators in the offenses and recantation statements of several of them. The United States offered evidence to rebut the relators' assertions of torture and duress. In considering this evidence, the Court stated as follows:

> Where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane in an extradition proceeding. *In Matter of Extradition of Contreras,* 800 F.Supp. 1462, 1469 (S.D.Tex.1992) Recanting statements are relevant in these proceedings as they affect probable cause. *Gill v. Imundi,* 747 F.Supp. 1028, 1049 (S.D.N.Y.1990); *Republic of France v. Moghadam,* 617 F.Supp. 777 (N.D.Cal. 1985). The essential question is whether the indicia of reliability is on the recantation or the initial statement.

*Extradition of Mainero,* 990 F.Supp. at 1222. The Court stated as follows respecting the assertions of torture:

> The suggestion of torture is certainly present in the record. The thought of

testimony coerced by torture is certainly abhorrent and inconsistent with tenets of our society. As a society we cannot suspend that concept by virtue of the interest of a foreign nation in the extradition of an United States citizen, the heinous nature of the offense notwithstanding. However, before we can indict evidence as tainted by the coercive effect of torture, satisfactory evidence must be present. Argument, inference and innuendo is all that has really been presented here. The allegations of torture supported by some of the self serving statements of witnesses and some factual conflicts ... Is unpersuasive as offered to totally obliterate probable cause under the *Contreras* analysis.... Ultimately, the Court concludes that there is no reliable evidence of torture or duress of the witnesses.

*Extradition of Mainero,* 990 F.Supp. at 1226.

■ The following rule is apparent. A statement of a relator's alleged accomplice or coconspirator recanting an earlier statement inculpating relator is contradictory and therefore not admissible in extradition proceedings. If it is evident, however, that the inculpating statement was coerced and not made voluntarily, the recanting statement is admissible, and consideration is given to which of the statements is more reliable in view of the totality of the evidence. Important factors in assessing which statement is more

reliable are (1) whether a Court in the requesting State has determined that the inculpating statement was coerced and involuntary; (2) where, when and under what circumstances the alleged accomplice or coconspirator made his initial statement inculpating relator; (3)where, when, whether at first opportunity or later, and under what circumstances the alleged accomplice or coconspirator recanted his earlier statement; and (4) whether either statement is corroborated by other evidence.

*United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment*

■ The question posed by the Relator as stated by his attorney is "[W]hether, in light of the Convention Against Torture, ... Mr. Yasin's statements are admissible at all." (Document No. 19, p. 33.) It appears that no Court has considered whether Article 15 of the Convention Against Torture has any proscriptive effect upon consideration of evidence presented as a basis for a finding of probable cause which is the product of torture in extradition proceedings. Rather, Courts have considered the Convention Against Torture in the context of allegations under Article 3 that a person to be expelled, returned or extradited to another State will be in danger of being subjected to torture.[11] Having examined decisions of

11. Article 3 of the Convention Against Torture states as follows:

1. No State party shall expel, return ... or extradite a person to another State where there is substantial grounds for believing that he would be in danger of being subjected to torture.
2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned

of a consistent pattern of gross, flagrant or mass violations of human rights.
Article 1 defines "torture" as follows:
For the purposes of this Convention, the term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason

these Courts, this Court concludes that Article 15 of the Convention Against Torture is not self-executing and is therefore not judicially enforceable and adheres to the evidentiary standard discussed above.

▮▮▮▮ The Senate made the following statement in approving the Convention Against Torture in 1990:

> III. The Senate's advice and consent is subject to the following declarations:
>
> (1) That the United States declares that provisions of articles 1 through 16 of the Convention are not self-executing.

(Document No. 16, Exhibit V.) "Self-executing provisions of a treaty become effective and binding upon the parties immediately upon ratification of the treaty." *Haitian Refugee Center v. Baker*, 789 F.Supp. 1552, 1568 (S.D.Fla.1991). A treaty which is designated "not self-executing" does not become effective as judicially enforceable law without the enactment of implementing legislation. *See Buell v. Mitchell*, 274 F.3d 337, 372 (6th Cir.2001). By approving the Convention Against Torture and declaring that it is not self-executing, the United States Senate effectively made the Convention subject to the well established rule of non-inquiry. *See* 15 Geo. Immigr. L.J. 183, Article 15 of the Torture Convention: Enforcement in U.S. Extradition Proceedings (Fall, 2000). The rule of non-inquiry "presumes that countries with which the United States has entered into extradition treaties will treat those extradited under those treaties fairly." *Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911). Inquiry is prohibited into the conditions and treatment which a relator might face upon extradition. *Sandhu v. Bransom*, 932 F.Supp. 822, 828 (N.D.Tex.1996).

In 1998, in enacting the Foreign Affairs Reform and Restructuring Act [FARRA], Congress required that regulations be developed implementing the obligations of the United States under Article 3 of the Convention "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105—277, § 2242(b), 1999 U.S.C.C.A.N. (112 Stat. 2681) 871. The FARRA therefore expressly incorporates the Senate's declarations and, consistently therefore with the Senate's declaration that the Convention is not self-executing, provides that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention [on Torture] ... except as part of the review of a final order of removal" under 8 U.S.C. § 1252. *Id.*, § 2242(d). The implementing regulations reiterate this: "there shall be no judicial appeal or review of any action, decision or claim raised under the Convention [on Torture or § 2242], except as part of the review of the final order of removal" under § 1252. 8 C.F.R. § 208.18(e). The Court further notes that the Department of State adopted regulations which set forth procedures within the Department for reviewing and deciding challenges to extradition based upon allegations of anticipated torture. 22 C.F.R. §§ 95.1—95.4 (2000).

In *Cornejo–Barreto v. Seifert*, 218 F.3d 1004 (9th Cir.2000), relator, charged in Mexico with homicide and other violent crimes, was arrested and held for extradition. Alleging that he had been tortured in Mexico and would be if extradited, rela-

---

based on discrimination of any kind, when such pain or suffering is inflicted or at the instigation of or with the consent or acquiescence of a public official or other person

acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanction. (Document No. 16, Exhibit IV.)

tor invoked Article 3 of the Convention Against Torture. The Magistrate Judge conducted a hearing on the subject, and relator submitted evidence that he was tortured and threatened and forced to sign documents including confessions which he was not permitted to read. The Magistrate Judge found that relator was likely to be tortured if extradited. The Magistrate Judge determined, however, that his role was limited to determining whether probable cause existed to believe that relator committed the crimes charged. He considered the evidence of torture only insofar as it undermined the credibility of the United States' evidence. The Ninth Circuit noted that the Magistrate Judge's finding that relator would likely be tortured if extradited was "irrelevant to his task of determining whether there was probable cause to believe [relator] committed the crime charged." *Id.*, 218 F.3d at 1008, n. 3. Having considered the sufficiency of the evidence independent of the documents claimed to have been the product of torture, the Magistrate Judge certified relator for extradition. Relator filed a petition for writ of *habeas corpus*, and the District Court denied it finding that Article 3 of the Convention Against Torture was not self-executing and therefore could not be invoked in Court as a basis for opposing extradition. The Ninth Circuit affirmed the District Court's denial directing, however, that the denial of *habeas* relief be without prejudice in view of the FARRA. The Court ruled that a person certified for extradition and ordered to be surrendered by the Department of State who claims that he will be tortured if extradited is entitled to judicial review of the State Department's decision to extradite him. *Id.*, 218 F.3d at 1015—16.

12. *See United States v. Noriega*, 808 F.Supp. 791, 797 n. 8 (S.D.Fla.1992), holding that some provisions of the Geneva Convention

In view of the foregoing, the Court finds that obligations under Article 15 of the Convention Against Torture have not been implemented legislatively, and accordingly, they are not judicially enforceable.[12] Article 15 can have no proscriptive effect upon the Court's consideration of Mr. Yasin's statements inculpating Relator. Rather, his statements are subject to reliability analysis in accordance with *Eain* and the other cases briefed above. The Court further finds that the State Department Reports submitted by Relator are irrelevant to the Court's determination of probable cause.

## ANALYSIS

The Parties stipulated at the extradition hearing that the first four factors which the Court must consider have been met. (Document No. 19, pp. 6—8.) The Court finds, and it is not disputed, that the Republic of Turkey has submitted documents fully in conformity with the requirements of Article 7(1) of the Treaty including (1) the Memorandum of a Judge in the Izmir Court of State Security of the Republic of Turkey stating the facts of the case and requesting the extradition of Lior Atuar to Turkey, (2) a copy of the applicable Articles of the Turkish Criminal Code, (3) the March 5, 1992, Warrant for the Arrest of Lior Atuar, (4) documents identifying Relator as Lior Atuar and (5) the March 20, 1992, Decision of the State Security Court of the Republic of Turkey charging Lior Atuar and the others with selling and purchasing heroin in violation of the Turkish Criminal Code. The Court finds that the March 20, 1992, Decision of the State Security Court of the Republic of Turkey is a charging document somewhat like an In-

Relative to the Treatment of Prisoners of War are self-executing while others are not.

dictment which justifies the issuance of an arrest warrant in the United States.

### Identification

Relator "Daniel Rozen" is Lior Atuar named in the Izmir State Security Court March 5, 1992, Warrant of Arrest and March 20, 1992, Decision. By March, 1992, Turkish authorities with the help of Mr. Yasin clearly had identified Lior Atuar as the person who participated along with Mr. Yasin and others in the heroin transaction and had gathered accurate information about Mr. Atuar. On December 11, 1991, Fahri Yasin, shown pictures of Lior Atuar and Itamar Siani, identified the person depicted in a photograph as Lior Atuar as the person charged with him in the heroin transaction. On March 5, 1992, the Izmir State Security Court issued a Warrant of Arrest of Lior Atuar indicating that Lior Atuar was an Israeli citizen, August 30, 1963, was his date of birth, 583456 was his Israel identification card number, and 4364188 was his passport number. The United States' Exhibit 5, the Interpol Red Notice containing a 1991 photograph and fingerprints of Lior Atuar as they were taken in Israel, indicates that Lior Atuar was born in Israel on August 30, 1963, had Israel identification card number 5834546 and passport number 4364188, information nearly identical to that included in the March 5, 1992, Warrant of Arrest for Lior Atuar. The Court finds based upon seeing "Daniel Rozen" in Court and looking at the picture of Lior Atuar on the Interpol Red Notice that "Daniel Rozen" is Lior Atuar. "Daniel Rozen" stated in completing his Financial Affidavit that his date of birth is August 30, 1963, consistently represented as Lior Atuar's date of birth in the record. (Document No. 4.) Mr. Yasin referred to "Davit" or "David" in his May 12, 1991, statement and his statements as reflected in Protocol of the December 17, 1991, Session in the Court of State Security of the Republic of Turkey at which he was represented by an attorney, and then referred to "Davit also known as Itamar Siani also known as Lior Atuar" in his November 13, 2003, Declaration, offered as evidence in this case. Thus, the record is consistent and supports the Court's identification of Relator as Lior Atuar named in the Izmir State Security Court March 5, 1992, Warrant of Arrest and March 20, 1992, Decision.

### The Statements and Declaration of Fahri Yasin

It is evident from the documents of proceedings in Turkey in 1991 that Mr. Yasin was interrogated and tortured shortly after his arrest on May 3, 1991, and at the time he made his May 12, 1991, statement. He appeared in Court on May 16, 1991, and when asked to give a statement, he said "I Fahri Yasin am for 15 days in the superintendence. By God! I am not well and healthy to give a statement." At the December 17, 1991, Session in the Court of State Security of the Republic of Turkey Mr. Yasin, represented by an attorney, stated upon the reading of his examinations and statements given in Antalya Criminal Court that "they are same and right. My statements are valid." He also stated that "I have been kept 15 days in torture. I could not flee." Though Mr. Yasin apparently made these statements in Court proceedings, no Turkish Court deemed Mr. Yasin's May 12, 1991, statement or other statements involuntary or unreliable. Indeed, Mr. Yasin's statements are the basis for the charges against Relator contained in the March 20, 1992, Decision of the State Security Court of the Republic of Turkey. Nevertheless, this Court finds in view of his pronouncements over twelve years ago that Mr. Yasin's statement contained in his November 13, 2003 Declaration that he was tortured is credible and germane to the Court's determination of probable cause. Mr. Yasin's

November 13, 2003, Declaration is therefore admitted.

■ Notwithstanding the evidence of Mr. Yasin's torture during the initial investigation into the heroin scheme, the Court finds Mr. Yasin's 1991 statements inculpating Lior Atuar in the heroin scheme more reliable than the statements contained in his November 13, 2003, Declaration, indicating that Mr. Atuar was not involved. There is no evidence corroborating Mr. Yasin's contention that he was subject to torture when he made his statement in May, 1991. Even though Mr. Yasin stated in Court that he was tortured in the interrogation process, no Turkish Court found that his statements were made involuntarily and deemed them unreliable. Mr. Yasin made his statements inculpating Mr. Atuar while his prosecution was ongoing. No doubt Mr. Yasin was anticipating that he might be eligible for lighter treatment if he cooperated and gave truthful statements. Of course, assuming that Mr. Yasin was actually subject to torture when he made his May 12, 1991, statement, it is likely as well that Mr. Yasin would make up a story, but thereafter, Mr. Yasin remained consistent in his rendition of the facts and Mr. Atuar's participation in the heroin scheme. Mr. Yasin identified Mr. Atuar at the Antalya airport on May 10, 1991. On December 11, 1991, Mr. Yasin gave authorities a sufficient enough identification of Mr. Atuar as his accomplice in the heroin scheme that they were able to state information about Mr. Atuar accurately in the May 5, 1992, Warrant for his Arrest. In Court proceedings and in cooperating with authorities, Mr. Yasin had at least two opportunities to renounce his May 12, 1991, statement inculpating Relator, but he did not. Rather, at the December 17, 1991, Session, Mr. Yasin, represented by an attorney, indicated that his statement was true. The March 20, 1992, Decision of the State Security Court of the Republic indicates that Mr. Yasin stated in

Court respecting Hasan Erkus that "the person who brought the heroin was not the accused person that was present in the court." Mr. Yasin, apparently feeling no pressure or coercion though the case was pending against him, did not identify Hasan Erkus as a participant in the heroin scheme, and Mr. Erkus was acquitted. Mr. Yasin did not retract his statements inculpating Mr. Atuar until November 3, 2003, when he made his Declaration. Mr. Atuar's May 10, 1991, escape from Turkish authorities soon after he was detained at the Antalya airport and his use of aliases also indicate his culpability. In view of all of these circumstances, the Court finds that reasonable grounds exist to believe that Mr. Atuar committed the crimes with which he is charged in the Republic of Turkey. The Republic of Turkey has satisfied the documentary and other procedural requirements of the Treaty and has sustained its burden of establishing probable cause to believe that Mr. Atuar committed the alleged violation of the Turkish Criminal Code. Accordingly, having found the evidence sufficient to sustain the charges against Relator under the Extradition and Mutual Assistance in Criminal Matters Treaty between the United States of America and the Republic of Turkey, the Court will enter a Certification of Extraditability and will order Relator to be held in custody pending his extradition to the Republic of Turkey. At the extradition hearing, Relator requested a stay of any Certification which the Court might issue in order that he may file a petition for writ of *habeas corpus*. (Document No. 19, p. 59.) The Court was disinclined to grant Relator's request but has found that such requests have been granted in other cases. The Court will therefore grant Relator's request for a stay of the Certification. The Certification will be stayed on the condition that Relator file a petition for

writ of *habeas corpus* within thirty days from the date of its entry.

The Clerk is directed to mail a copy of this Memorandum Opinion to Relator, counsel of record, the Office of Probation and the United States Marshal Service.

### CERTIFICATION OF EXTRADITABILITY

For reasons stated in the Court's Memorandum Opinion filed herewith, the Court finds that Lior Atuar, also known and currently incarcerated at FCI Beckley, West Virginia, as "Daniel Rozen", is extraditable, to the Republic of Turkey pursuant to the Extradition and Mutual Assistance in Criminal Matters Treaty between the United States of America and the Republic of Turkey.

In accordance with 18 U.S.C. § 3184, it is hereby **CERTIFIED** to the Secretary of State of the United States of America that the evidence against Lior Atuar, also known and currently incarcerated at FCI Beckley, West Virginia as "Daniel Rozen" is sufficient to support a finding of probable cause that Mr. Atuar committed the offenses with which he is charged in the Republic of Turkey and is extraditable under the aforesaid Treaty.

It is therefore hereby **ORDERED** pursuant to 18 U.S.C. § 3184 that a copy of this Certification of Extraditability, all evidence submitted to the Court on the issue of extradition, the transcript of the extradition hearing, and the Court's Memorandum Opinion filed herewith be **CERTIFIED** to the Secretary of State of the United States that a warrant may issue upon the requisition of the proper authorities of the Republic of Turkey for the surrender of Lior Atuar, also known and currently incarcerated at FCI Beckley, West Virginia, as "Daniel Rozen", according to the stipulations of the Extradition and Mutual Assistance in Criminal Matters Treaty between the United States of America and the Republic of Turkey.

At the extradition hearing, Relator requested a stay of any Certification which the Court might issue in order that he may file a petition for writ of *habeas corpus.* (Document No. 19, p. 59.) The Court hereby **GRANTS** Relator's request for a stay of the Certification. The Certification will be stayed on the condition that Relator file a petition for writ of *habeas corpus* within thirty days from the date of entry stated below.

The Clerk is further directed to send a copy of this Certification of Extraditability to Relator Lior Atuar, also known as "Daniel Rozen", counsel of record, the United States Marshal Service and the Office of Probation.